ROGERS, C.J.
**657 "Next in importance to freedom and justice is popular education, without which neither justice nor freedom can be permanently maintained." Letter from James A. Garfield accepting the presidential nomination (July 12, 1880), The American Presidency Project, available at http://www.presidency.ucsb.edu/ws/index.php?pid=76221 (last visited January 17, 2018). In the present case, we acknowledge that the plaintiffs have painted a vivid picture of an imperfect public educational system in this state that is straining to serve many students who, because their basic needs for, among other things, adequate parenting, financial resources, housing, nutrition and care for their physical and psychological health are not being met, cannot take advantage of the educational opportunities that the state is offering.[1] We are highly *34 sympathetic to the plight **658 of these struggling students. Indeed, we join our voice to the voices of those who urge the state to do all that it reasonably can to ensure not only that all children in this state have the bare opportunity to receive the minimally adequate education required by article eighth, § 1, of the Connecticut constitution,[2] but also that the neediest children have the support that they need to actually take advantage of that opportunity. It is not the function of the courts, however, to create educational policy or to attempt by judicial fiat to eliminate all of the societal deficiencies that continue to frustrate the state's educational efforts. Rather, the function of the courts is to determine whether the narrow and specific criteria for a minimally adequate educational system under our state constitution have been satisfied. Once a determination of minimal adequacy has been made, courts simply are not in a position to determine whether schools in poorer districts would be better off expending scarce additional resources on more teachers, more computers, more books, more technical staff, more meals, more guidance counselors, more health care, more English instruction, greater preschool availability, or some other resource. Such judgments are quintessentially legislative in nature. Because we conclude that the trial court was correct in its initial **659 determination that the plaintiffs failed to establish that the state's educational offerings are not minimally adequate under article eighth, § 1, and in its determination that the state has not violated their equal protection rights under the state constitution, the plaintiffs cannot prevail on their claims that the state has not provided them with a suitable and substantially equal educational opportunity.
The individual plaintiffs[3] and the named plaintiff, the Connecticut Coalition for Justice in Education Funding, Inc. (Coalition), brought this action seeking, among other things, a declaratory judgment that the defendants, various state officials and members of the State Board of Education,[4] failed to provide suitable and substantially *35 equal educational opportunities to the individual plaintiffs in violation of article eighth, § 1, and article first, §§ 1 and 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments.[5] Applying the controlling legal standard, as set **660 forth in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , 295 Conn. 240, 342-43, 990 A.2d 206 (2010) (Palmer, J. , concurring in the judgment), the trial court held that the plaintiffs have not established that the state has failed to provide children in any school district in this state with minimally adequate teachers, educational facilities and instrumentalities, as required by article eighth, § 1. In addition, the court concluded that the plaintiffs had failed to establish a violation of the equal protection provisions of the state constitution, article first, §§ 1 and 20. The trial court then proceeded to apply, however, a new legal standard that is not supported by our precedent, pursuant to which that court considered numerous educational policies and practices that are not part of the controlling standard, and held that the state's educational policies and spending practices violate article eighth, § 1, because they are not "rationally, substantially and verifiably connected to creating educational opportunities for children."
The defendants appeal from the trial court's decision that they have violated article eighth, § 1, and the plaintiffs cross appeal from the trial court's rulings that they did not establish that the state has failed to provide minimally adequate educational opportunities to the children in any school district in the state and have not violated the plaintiffs' equal protection rights under the state constitution.[6] We conclude that the trial court **661 properly found that the plaintiffs have failed to present sufficient evidence that the state is not providing children in this state with minimally adequate educational resources that satisfy the requirements of article eighth, § 1. We further conclude that, having made this determination, the trial court should have held that the defendants have not violated that constitutional provision, and it should not have gone on to apply a new constitutional test. Finally, we conclude that the trial court properly found that the plaintiffs failed to establish that the state has violated the equal protection provisions of the state constitution. We therefore conclude that the plaintiffs have failed to establish that the defendants have violated the plaintiffs' rights under article eighth, § 1, and article first, §§ 1 and 20. Accordingly, we affirm in part and reverse in part the judgment of the trial court. *36 The record reveals the following procedural history and facts that either were found by the trial court or are undisputed. In 2005, the plaintiffs filed a complaint alleging, among other things, that the defendants had violated article eighth, § 1, and article first, §§ 1 and 20, of the state constitution by "failing to maintain a public school system that provides [them] with suitable and substantially equal educational opportunities ...." Thereafter, the defendants filed a motion to strike certain portions of the complaint, claiming that these state constitutional provisions do not confer a right to " 'suitable' " educational opportunities and do not "guarantee equality or parity of educational achievement or results." The trial court concluded that the plaintiffs' claims were justiciable, but that article eighth, § 1, did not guarantee a right to a suitable public education. Accordingly, the trial court granted the defendants' motion to strike the portions of the plaintiffs' complaint making that claim.
Thereafter, the Chief Justice granted the plaintiffs' application for certification to appeal to this court pursuant **662 to General Statutes § 52-265a. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 243-44, 990 A.2d 206. In a split opinion, a majority of this court concluded that the trial court had improperly granted the defendants' motion to strike. Id., at 320, 990 A.2d 206 ; id., at 320-21, 990 A.2d 206 (Palmer, J. , concurring in the judgment). As the following discussion of the positions taken by the justices in their respective opinions makes clear, because Justice Palmer's concurring opinion provided the narrowest grounds of agreement, it was controlling. See State v. Ross , 272 Conn. 577, 604 n.13, 863 A.2d 654 (2005) ("[w]hen a fragmented [c]ourt decides a case and no single rationale explaining the result enjoys the assent of [a majority], the holding of the [c]ourt may be viewed as the position taken by those [m]embers who concurred in the judgments on the narrowest grounds" [internal quotation marks omitted] ), quoting Marks v. United States , 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).
Justices Norcott, Katz and Schaller concluded in a plurality opinion that the plaintiffs' claims were justiciable and, therefore, that this court had subject matter jurisdiction over the appeal. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 269, 990 A.2d 206 (plurality opinion). The plurality then agreed with "the New York Court of Appeals' explication of the 'essential' components requisite to this constitutionally adequate education, namely: (1) 'minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn'; (2) 'minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks'; (3) 'minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies'; and (4) 'sufficient personnel adequately trained to teach those subject areas.' [
**663 Campaign for Fiscal Equity, Inc. v. State , 86 N.Y.2d 307, 317, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) ( Campaign I ) ]; see also, e.g., [ Abbeville County School District v. State , 335 S.C. 58, 68, 515 S.E.2d 535 (1999) ] (state constitution requires provision to students of 'adequate and safe facilities in which they have the opportunity to acquire: [1] the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; [2] a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and [3] academic and vocational skills'); Pauley v. Kelly , 162 W. Va. 672, 706, 255 S.E.2d 859 (1979) (provision of *37 constitutionally adequate education 'implicit [ly]' requires 'supportive services: [1] good physical facilities, instructional materials and personnel; [2] careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency')." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 316, 990 A.2d 206.
The plurality further concluded that "article eighth, § 1, entitles Connecticut public school students to an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting. A constitutionally adequate education also will leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy. To satisfy this standard, the state, through the local school districts, must provide students with an objectively meaningful opportunity to receive the benefits of this constitutional right." (Footnote omitted; internal quotation marks omitted.) Id., at 314-15, 990 A.2d 206.
The plurality emphasized, however, that a public education system "need not operate perfectly" to be constitutionally adequate; (internal quotation marks omitted) id., at 315-16, 990 A.2d 206, quoting **664 Neeley v. West Orange-Cove Consolidated Independent School District , 176 S.W.3d 746, 787 (Tex. 2005) ; and that constitutional adequacy is determined not by " 'what level of achievement students reach, but on what the state reasonably attempts to make available to them, taking into account any special needs of a particular local school system.' " Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 316, 990 A.2d 206, quoting Sheff v. O'Neill , 238 Conn. 1, 143, 678 A.2d 1267 (1996) (Borden, J. , dissenting); see also Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 318-20, 990 A.2d 206 (discussing cases supporting notion that article eighth, § 1, was not intended to require state to provide remedies for all social ills that might hinder ability of students to take advantage of educational opportunities). Thus, the plurality recognized that "the education clause [of our state constitution] is not a panacea for all of the social ills that contribute to many of the achievement deficiencies identified by the plaintiffs in their complaint ...." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 320, 990 A.2d 206. Having concluded that the plaintiffs' claims pursuant to article eighth, § 1, were justiciable and that the constitutional provision contains a qualitative component, the plurality concluded that the trial court had improperly stricken the plaintiffs' claims pursuant to that provision. See id.
In his concurring opinion, Justice Palmer agreed with the plurality that the plaintiffs' claims were justiciable, although he did not entirely agree with the plurality's analysis of that issue. Id., at 322, 990 A.2d 206 (Palmer, J. , concurring in the judgement). With respect to the "qualitative component" of the right guaranteed by article eighth, § 1, Justice Palmer concluded that provision "requires only that the legislature establish and maintain a minimally adequate system of free public schools." Id., at 332, 990 A.2d 206. Specifically, Justice Palmer agreed with the four criteria **665 adopted by the New York Court of Appeals in Campaign I, supra, 86 N.Y.2d at 317, 631 N.Y.S.2d 565, 655 N.E.2d 661, and adopted by the plurality as part of its constitutional standard. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 342, 990 A.2d 206 (Palmer, J. , concurring in the judgment). In addition, Justice Palmer concluded that "a safe and secure environment *38 also is an essential element of a constitutionally adequate education."[7] Id., at 342 n.15, 990 A.2d 206. Justice Palmer ultimately concluded that, although "portions of the plaintiffs' complaint reasonably may be read as asserting a right to a quality of education under article eighth, § 1, that exceeds the parameters of the right" as he conceived it, their allegations were sufficiently broad to withstand a motion to strike under this standard. Id., at 346 n.20, 990 A.2d 206.
Justice Palmer expressly rejected, however, the plurality's suggestion that it was appropriate "to craft the constitutional standard in broad terms." (Internal quotation marks omitted.) Id., at 342 n.17, 990 A.2d 206 (Palmer, J. , concurring in the jugment); see also id., at 317, 990 A.2d 206 (plurality opinion) ("[w]e recognize that our explication of a constitutionally adequate education under article eighth, § 1, is crafted in broad terms"). Justice Palmer contended that, "the broader the standard, the more vague it is likely to be. In addition, the broader the standard, the more difficult it will be for the parties and the court to understand **666 and apply it.... Although some constitutional standards must be defined in broad terms because of their applicability to a vast number of fact patterns, this is not such a case; for purposes of a case like the present one, in which it is critically important to give as much guidance to the court and the parties as possible, the more clearly defined the standard, the better. Cf. Moore v. Ganim , 233 Conn. 557, 629, 660 A.2d 742 (1995) (Peters, C. J. , concurring) ('well established jurisprudential doctrine counsels us to construe ambiguous constitutional principles narrowly')." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 342-43 n.17, 990 A.2d 206 (Palmer, J. , concurring in the judgment).
In addition, Justice Palmer disagreed with the plurality's decision to the extent that it could be interpreted to require the courts to examine educational outputs when determining the constitutional adequacy of the state's educational offerings.[8] See id., at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment) (rejecting plurality's assertion that "[a] constitutionally adequate education ... will leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy" because court's focus should be on adequacy of educational inputs, not level of achievement [internal quotation marks omitted] ). This is because, although "schools are important socializing institutions in our democratic society, they cannot be constitutionally required to overcome *39 every serious social and personal disadvantage that students bring with them to school, and that seriously hinder[s] the **667 academic achievement of those students." (Internal quotation marks omitted.) Id., at 344-45, 990 A.2d 206 (Palmer, J. , concurring in the judgment). "[B]ecause student achievement may be affected by so many factors outside the state's control, including, perhaps most particularly, the disadvantaging characteristics of poverty ... educational inputs must provide the primary basis for that determination." (Citation omitted; internal quotation marks omitted.) Id., at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment).
Justice Palmer also repeatedly emphasized that "the legislature is entitled to considerable deference with respect to both its conception of the scope of the right and its implementation of the right"; id., at 332, 990 A.2d 206 (Palmer, J. , concurring in the judgment); because "courts are ill equipped to deal with issues of educational policy; in other words, courts lack [the] specialized knowledge and experience to address the many persistent and difficult questions of educational policy that invariably arise in connection with the establishment and maintenance of a statewide system of education.... Thus, these issues are best addressed by our elected and appointed officials in the exercise of their informed judgment." (Citation omitted; internal quotation marks omitted.) Id., at 335-36, 990 A.2d 206 (Palmer, J. , concurring in the judgment); see also id. at 321, 990 A.2d 206 (courts should not "second-guess the reasoned judgment of the legislative and executive branches with respect to the education policy of this state"); id., at 328-29, 990 A.2d 206 (courts should defer "to the reasoned determination of the political branches with respect to the precise parameters of the right" to free public education); id., at 335 (courts should defer "to the reasoned judgment of the political branches with respect to the determination, in practice, of the parameters of the right" to free public education); id., at 336, 990 A.2d 206 ("within the limits of rationality, the legislature's efforts to tackle the problems [of education] should be entitled to **668 respect" [internal quotation marks omitted] ); id., at 335, 990 A.2d 206 ("[t]he judicial branch must accord the legislative branch great deference in this area"); id., at 336, 990 A.2d 206 ("[s]pecial deference is warranted in the present case due to the fact that the framers reserved to the legislature the responsibility of implementing the mandate of a free public education"); id., at 337, 990 A.2d 206 ("[a]nother compelling reason for judicial restraint in matters relating to educational policy is the potential that exists for a costly and intrusive remedy"); id., at 338, 990 A.2d 206 ("the significant separation of powers issues that any ... remedy invariably would spawn must be given due consideration in determining the scope of the right" to free public education); id., at 341-42, 990 A.2d 206 (courts must employ "a mode of constitutional interpretation that affords considerable deference to the legislature with respect to the manner in which the right to a minimally adequate free public education is conceived and implemented"); id., at 344 n.18, 990 A.2d 206 (approach of New York Court of Appeals in Campaign I "gives due regard to the prudential considerations that militate strongly in favor of judicial restraint in such matters"). Indeed, Justice Palmer recounted that "education ... presents a myriad of intractable economic, social, and even philosophical problems.... The very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that, within the *40 limits of rationality, the legislature's efforts to tackle the problems should be entitled to respect.... On even the most basic questions in this area the scholars and educational experts are divided." (Internal quotation marks omitted.) Id., at 336, 990 A.2d 206 (Palmer, J. , concurring in the judgment). "In such circumstances, the judiciary is well advised to refrain from imposing on the [state] inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation **669 so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions."[9] (Internal quotation marks omitted.) Id. (Palmer, J. , concurring in the judgment).
Thus, a majority of this court-Justices Norcott, Katz, Palmer and Schaller-agreed that the trial court had improperly struck the plaintiffs' claims, although Justice Palmer did not agree with the qualitative component of the right to free public education under article eighth, § 1, as described in the plurality opinion. Accordingly, this court remanded the case to the trial court for further proceedings on the claim that the defendants had failed to provide the plaintiffs with a suitable public education.
Thereafter, the plaintiffs filed a third amended complaint containing four counts, which is the operative pleading for purposes of this appeal.[10] The plaintiffs claimed that "[b]y failing to maintain a public **670 school system that provides the plaintiffs with suitable and substantially equal educational opportunities, the state is violating article eighth, § 1, and article first, §§ 1 and 20, of the state constitution" (first count); "[b]y failing to maintain a public school system that provides the plaintiffs with suitable educational opportunities, the state is violating article eighth, § 1, of the state constitution" (second count); "[b]y failing to maintain a public school system that provides the plaintiffs with substantially equal educational opportunities, the state is violating article eighth, § 1, and article first §§ 1 and 20, of the state constitution" (third count); and "the state's failure to maintain a public school system that provides the plaintiffs with suitable and substantially equal educational opportunities has disproportionately impacted African-American, Latino, and other minority students in violation of article eighth, § 1, and article first, §§ 1 and 20, of the [s]tate [c]onstitution and 42 U.S.C. § 1983" (fourth count).[11]
The defendants filed a motion to dismiss the complaint on the grounds that the plaintiffs' claims were not ripe for adjudication in light of certain education reforms that the legislature enacted in 2012, that their claims were moot in light of these *41 reforms and that the Coalition lacked associational standing to raise claims that its rights under article eighth, § 1, and article first, §§ 1 and 20, had been violated. The trial court, Dubay, J. , deferred ruling on the first two claims until a full trial on the merits had occurred and denied the motion to dismiss the Coalition's claims for lack of standing.
Thereafter, the case was tried before the court, Moukawsher, J.[12] In their posttrial brief, the defendants renewed their jurisdictional claims and, in addition, claimed that the individual plaintiffs lacked standing because, among other reasons, they had failed to establish any harm to any specific plaintiff. The trial court rejected the defendants' jurisdictional claims. The court then determined that Justice Palmer's concurring opinion **671 in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 320, 990 A.2d 206, provided the narrowest grounds of agreement among the four justices who had concluded that the plaintiffs' claims were justiciable and that article eighth, § 1, contains a qualitative component, and, therefore, his opinion was controlling. See State v. Ross , supra, 272 Conn. at 604 n.13, 863 A.2d 654. Applying the Campaign I criteria that Justice Palmer had adopted,[13] the trial court specifically found that (1) "[t]he plaintiffs [have not] proved by a preponderance of the evidence, or beyond a reasonable doubt, that the state's schools lack enough light, space, heat, and air to permit children to learn," (2) "the plaintiffs have not proved by a preponderance, and certainly not beyond a reasonable doubt, that there is a systemic problem that should spark a constitutional crisis and an order to spend more on [desks, chairs, pencils and reasonably current textbooks]," and (3) "the plaintiffs have plainly not met their burden to show beyond a reasonable doubt that Connecticut lacks minimally adequate teaching and curricula, nor have they proved it by a preponderance of the evidence."[14] Accordingly, the court held that the Campaign I criteria were satisfied.
The court then observed that, since 2012, the state had funneled "over $400 million in new money" into the state's thirty lowest performing school districts. In addition, the state had provided $13 million in financial **672 support to fourteen "failing schools," plus $4 million per year for school improvement grants to approximately thirty "high needs" schools. Finally, the court noted that there are numerous state and federal programs that are designed to provide meals to needy students, even during the summer, to invite parents into schools to share in learning, to attend to the needs of homeless students, to prevent sexually transmitted diseases, to attend to the needs of young parents and pregnant students, and to provide mental health support. The court *42 found that "[a]ll of this extra spending benefits poor districts but not wealthier districts. [This] is on top of basic education aid that has a history of strongly favoring poor districts over wealthier ones. This heavy tilt in state education aid in favor of the state's poorer communities shows the state is devoting to needy schools a great deal more in resources than is required by the modest standard [set forth by the Campaign I criteria and adopted by Justice Palmer]." Thus, the trial court expressly found that the state's educational offerings in needy districts are constitutionally adequate under Campaign I.[15] The court also concluded that this "tilt" was "fatal to the plaintiffs' equal protection claim" under article first, §§ 1 and 20, that the state has failed to provide substantially equal educational funding to needy and wealthy school districts.
The trial court then concluded, however, that, notwithstanding its conclusion that the state had satisfied **673 the Campaign I criteria set forth in Justice Palmer's controlling opinion, the state's educational system would not satisfy the requirements of article eighth, § 1, unless the state "deploy [ed] in its schools resources and standards that are rationally, substantially and verifiably connected to teaching children." The trial court apparently derived this standard from Justice Palmer's statements that the state's educational programs and policies would be unconstitutional if they were "so lacking as to be unreasonable by any fair or objective standard"; Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 321, 990 A.2d 206 (Palmer, J. , concurring in the judgment); and that the state must operate "within the limits of rationality." (Internal quotation marks omitted.) Id., at 336, 990 A.2d 206 (Palmer, J. , concurring in the judgment). The trial court reasoned that this rationality standard could not be the same as the low "[r]ational basis" standard for determining the constitutionality of legislative acts; State v. Long , 268 Conn. 508, 535, 847 A.2d 862 ("Rational basis review is satisfied so long as there is a plausible policy reason for the classification .... [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature." [Internal quotation marks omitted.] ), cert. denied, 543 U.S. 969, 125 S.Ct. 424, 160 L.Ed.2d 340 (2004) ; because this court held in Horton v. Meskill , 172 Conn. 615, 646, 376 A.2d 359 (1977) ( Horton I ), that "in Connecticut the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized." Applying this "rationally, substantially and verifiably connected" standard that had not previously been specified in Justice Palmer's concurring opinion, the trial court concluded that the state's current "school program" is unconstitutional because "[the state] has no rational, substantial and verifiable plan to distribute money for education aid and school construction," it has no **674 "objective and mandatory statewide graduation standard," "there is no way to know who the best teachers are and no rational and substantial connection between their compensation and their effect on teaching children," and the state's program of special education *43 spending is irrational. The court ordered the defendants to submit to the court plans to remedy these constitutional deficiencies within 180 days of the date of the judgment.[16]
The defendants then filed this appeal, in which they renew their claims that the individual plaintiffs lack standing because they have failed to present evidence that any of them has been specifically injured by the defendants' acts or omissions and that the Coalition lacks associational standing to raise claims under article eighth, § 1, and article first, §§ 1 and 20. The defendants also claim that, after the trial court found that the state's schools met the Campaign I criteria adopted by Justice Palmer, that court improperly went on to apply a constitutional standard of its own devising. The defendants further contend that, even if the trial court properly adopted this new constitutional standard, it improperly applied it to conclude that the educational system is unconstitutional under article eighth, § 1. On cross appeal, the plaintiffs contend that the trial court improperly concluded that (1) the state's educational system meets the Campaign I criteria for determining the adequacy of the state's schools under article eighth, § 1, and (2) the state's educational system does not violate their equal protection rights under article first, §§ 1 and 20.[17]
**675 We conclude that all of the plaintiffs have standing. We also conclude that the trial court properly held that the plaintiffs failed to establish that the state's schools do not satisfy the Campaign I criteria, which is the controlling constitutional standard under Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. We agree with the defendants, however, that the trial court went on to improperly apply a constitutional standard of its own devising after concluding that the state's schools satisfied the controlling Campaign I criteria. Finally, based on the factual findings of the trial court, we conclude that the trial court properly determined that the plaintiffs failed to establish that the educational system in this state violates the equal protection provisions of the state constitution by failing to ensure that the poorer school districts had funding that is substantially equal to the wealthier school districts.
I
JURISDICTIONAL CLAIMS
We begin by addressing the defendants' jurisdictional claims that the individual plaintiffs lack standing because none of them has been specifically injured and that the Coalition lacks associational standing to raise its claims pursuant to article eighth, § 1, and article first, §§ 1 and 20. We disagree.
A
Standing of Individual Plaintiffs
It is well established that, "to have standing ... the plaintiffs necessarily *44 must establish that they are classically **676 aggrieved. In other words, they must demonstrate a specific, personal and legal interest in the subject matter of the controversy and that the defendants' conduct has specially and injuriously affected that specific personal or legal interest." Andross v. West Hartford , 285 Conn. 309, 324, 939 A.2d 1146 (2008). "Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes ... standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests." (Internal quotation marks omitted.) Electrical Contractors, Inc. v. Dept. of Education , 303 Conn. 402, 411, 35 A.3d 188 (2012). "[A] trial court's determination that it lacks subject matter jurisdiction because of a plaintiff's lack of standing is a conclusion of law that is subject to plenary review on appeal." (Internal quotation marks omitted.) Isabella D. v. Dept. of Children & Families , 320 Conn. 215, 228, 128 A.3d 916, cert. denied, --- U.S. ----, 137 S.Ct. 181, 196 L.Ed.2d 124 (2016).
In the present case, the plaintiffs' complaint alleged that "[t]he state's failure to provide suitable education opportunities is evidenced by the fact that many plaintiffs attend schools that do not have the resources necessary to educate their high concentrations of poorly performing students" and that "[t]he state's failure to provide substantially equal educational opportunities is evidenced by the fact that, when compared to [other] students, a disparate number of the plaintiff students attend schools that do not have the resources necessary to educate their high concentrations of poorly performing students." If the plaintiffs had proved these allegations at trial, the trial court could have inferred a specific injury to the individual plaintiffs from the fact that they attended constitutionally inadequate schools. Although we conclude in parts III and IV of this opinion that the plaintiffs failed to prove any constitutional violation, the failure of a plaintiff to prove a colorable **677 claim of specific harm at trial does not deprive the trial court of subject matter jurisdiction. See In re Jose B. , 303 Conn. 569, 579, 34 A.3d 975 (2012) (rejecting "bizarre result that the failure to prove an essential fact at trial deprives the court of subject matter jurisdiction"). Accordingly, we conclude that the trial court properly determined that the complaint raised a colorable claim that the individual plaintiffs' "specific, personal and legal interest" in receiving the opportunity for an education that complies with the qualitative component of article eighth, § 1, and their interest in receiving an educational opportunity that is substantially equal to the opportunity received by other public school students in accordance with article first, §§ 1 and 20, was being "specially and injuriously affected" by the defendants' acts or omissions. Andross v. West Hartford , supra, 285 Conn. at 324, 939 A.2d 1146.
B
Coalition's Associational Standing
We next address the defendants' claim that the Coalition lacked associational standing. This court has held that "[a]n association has standing to bring [an action] on behalf of its members when: (a) its members would otherwise have standing to [bring the action] in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the [action]." (Internal quotation marks omitted.) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell , 199 Conn. 609, 616, 508 A.2d 743 (1986) ( Worrell ). The defendants contend that the Coalition meets none of the *45 prongs of the Worrell test. For the following reasons, we disagree. **678 1
First Prong of the Worrell Test
The defendants contend that the Coalition does not satisfy the first prong of the Worrell test for associational standing because the only individual members of the Coalition that would have personal standing to raise the claims set forth in the complaint are the members who are the parents of students attending public schools, and the parents "are not in fact 'members' in any real sense" because they lack voting rights in the Coalition.[18] The defendants point out that, when this action was initiated in 2005, the Coalition's bylaws provided that the Coalition "shall act by and through its [b]oard of [d]irectors.... The [b]oard's powers include, but are not limited to, the power to initiate and pursue litigation ... and to make spending decisions." The bylaws also provided for several categories of membership, including individual members, which is the category that would include parents. All classes of membership except the class of individual members had the right to elect a member or members from their class to serve on the Coalition's board of directors.
The 2013 version of the Coalition's bylaws authorized a membership class specifically for parents. Parent members still did not have the right to vote,[19] but they **679 did have the right to participate in general membership meetings. The bylaws also provided that the powers of all members of the Coalition "include, but are not limited to, the power to initiate and pursue litigation, to hire experts and other staff, and to make spending decisions." In addition, the bylaws provided that two parent members would be members of the Coalition's steering committee, which, among other duties, had the responsibility to oversee the Coalition's routine business, to "steer policies and promote strategies aimed at ensuring progress toward achieving the goals and objectives" of the Coalition, to "provide ongoing direction, advice, and support to [a]gents of the [c]orporation," and to "modify the budget as is reasonable and necessary ...."
The defendants contend that the parents were not true members of the Coalition because the 2005 version of the Coalition's bylaws "gave the power to initiate and pursue litigation to a board over which the parent members had no voice whatsoever" because they lacked voting rights. The defendants also contend that, despite the provisions of the 2013 bylaws allowing parent members to belong to the Coalition's steering committee and to have the same powers as other members "to initiate and pursue litigation, to hire experts and other staff, and to make spending decisions," these powers were illusory because the parent members still had no right to vote. Thus, the defendants claim, the parent *46 members are not true members of the Coalition, but "are simply pawns added in an attempt to provide standing."
The decision of the United States Supreme Court in Hunt v. Washington State Apple Advertising Commission , 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), from which the Worrell test is derived; see Connecticut Assn. of Health Care Facilities, Inc. v. Worrell , supra, 199 Conn. at 615-16, 508 A.2d 743 ; provides some guidance on this issue. In Hunt , the defendant, the governor **680 of North Carolina, contended that the plaintiff, a Washington state agency charged with promoting and protecting the apple industry of the state of Washington (commission), lacked associational standing to bring a claim challenging the constitutionality of a North Carolina statute because the commission did not have any personal stake in the outcome of the litigation, and it was not a proper representative of the apple growers and dealers, who might have such a personal stake, because the apple growers and dealers were not members of the commission. See Hunt v. Washington State Apple Advertising Commission , supra, 336-37, at 341-42, 97 S.Ct. 2434. The United States Supreme Court held that, "while the apple growers and dealers are not 'members' of the [c]ommission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the [c]ommission; they alone may serve on the [c]ommission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them. In a very real sense, therefore, the [c]ommission represents the [s]tate's growers and dealers and provides the means by which they express their collective views and protect their collective interests." Id., at 344-45, 97 S.Ct. 2434. Accordingly, the court concluded, the commission had associational standing. Id., at 345, 97 S.Ct. 2434.
We conclude that, contrary to the defendants' claim in the present case, Hunt does not stand for the proposition that the right to vote is an essential characteristic of membership in an association for purposes of establishing the first prong of the Worrell test. Although the court in Hunt observed that the apple growers and dealers elected the commission's members and financed its activities, the court did not say that those facts were necessary to establish associational standing if there was other evidence of representation and control. Rather, the court determined that the facts that **681 the apple growers and dealers served on the commission and that the commission represented their interests and provided a means for them to express their collective views were indicia of membership for purposes of establishing associational standing. See Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc. , 675 F.3d 149, 157-59 (2d Cir. 2012) (characterizing Hunt as holding that "representation and control" are indicia of membership that gives rise to associational standing); see also Citizens Coal Council v. Matt Canestrale Contracting, Inc. , 40 F.Supp.3d 632, 640 (W.D. Pa. 2014) ("[J]ust because [the association's members] lacked voting rights when this [action] was commenced, that factor alone is not sufficient to defeat associational standing .... Nothing in Hunt indicates that the factors delineated there are the only factors to be considered.... Rather, the purpose of the Hunt inquiry is to determine whether an organization provides its members with the means to express their collective views and protect their collective interests." [Internal quotation marks omitted.] ).
In any event, Hunt involved a plaintiff that was not a true voluntary membership *47 association. See Hunt v. Washington State Apple Advertising Commission , supra, 432 U.S. at 342, 97 S.Ct. 2434 ("the [c]ommission is not a traditional voluntary membership organization such as a trade association, for it has no members at all"). At least one court has held that, when a plaintiff is a true voluntary membership organization, as in the present case, Hunt's "indicia of membership" test does not apply. California Sportfishing Protection Alliance v. Diablo Grande, Inc. , 209 F.Supp.2d 1059, 1066 (E.D. Cal. 2002) (Hunt's "indicia of membership" test does not apply to true voluntary membership association); see Citizens Coal Council v. Matt Canestrale Contracting, Inc. , supra, 40 F.Supp.3d at 643 (members' lack **682 of voting rights did not defeat associational standing of voluntary membership association).
Nevertheless, even if some evidence of representation and control were required to establish membership, even for a true voluntary membership association, we conclude that the fact that two parent members of the Coalition serve on its steering committee provides sufficient evidence of their control, and the fact that the parent members have voluntarily joined the Coalition knowing that it has publicly advocated in favor of specific public school funding policies provides sufficient evidence that the Coalition represents their views. See Citizens Coal Council v. Matt Canestrale Contracting, Inc. , supra, 40 F.Supp.3d at 640 ("[t]he affirmative action of an organization's constituents to affiliate with the organization in order to support its advocacy efforts, and to disaffiliate with the organization when they are dissatisfied with those efforts, may provide nearly as much practical influence on management as the bare right to vote for directors" [internal quotation marks omitted] ). Indeed, we cannot perceive why the parent members would, by maintaining their membership status, allow the Coalition to use them as "pawns ... in an attempt to provide standing," as the defendants claim, if the Coalition was not representing their views or protecting their interests as they perceive them. We conclude, therefore, that the fact that the parent members lack voting rights does not defeat the Coalition's associational standing.
The defendants also claim, however, that, even if the parent members are now actual members of the Coalition for purposes of the first prong of the Worrell test, because the Coalition had no parent members when this action was initiated in 2005 the Coalition lacked standing at that time, and a subject matter jurisdictional defect that existed when the complaint was filed cannot be cured by a subsequent amendment. The **683 following additional procedural history is relevant to our resolution of this claim. After the plaintiffs filed their original complaint in 2005, the defendants filed a motion to dismiss the Coalition's claims for lack of standing under Worrell. The trial court, Shortall, J. , granted the motion. In his memorandum of decision, Judge Shortall noted that, according to an affidavit filed by counsel for the Coalition, and contrary to the allegations of the original complaint, the Coalition had no parent members when the complaint was filed. Although the plaintiffs had filed an amended complaint alleging that the Coalition now had parent members, and submitted an affidavit to that effect, the amended complaint did not allege that the parent members were "parents of students in the public schools of Connecticut." Accordingly, the court concluded that the Coalition did not meet the first prong of the Worrell test.
Thereafter, the plaintiffs sought leave to file a second amended complaint in order to cure the standing deficiency by including an allegation that the Coalition's parent *48 members were parents of students in the Connecticut public schools. The trial court granted the request for leave to amend over the objection of the defendants. As we have previously explained in this opinion, the trial court subsequently granted the defendants' motion to strike portions of the second amended complaint, and the plaintiffs appealed from that ruling to this court pursuant to § 52-265a. After this court reversed the decision of the trial court and remanded the case for further proceedings, the plaintiffs were granted leave to file a third amended complaint and defendants filed another motion to dismiss the Coalition's claims for lack of standing. The trial court, Dubay, J. , denied the motion.
The defendants claim that Judge Dubay improperly denied their motion to dismiss the Coalition's claims because, at the time that the original complaint was **684 filed, the Coalition had no parent members who would have had standing to bring this action in their own right, and a jurisdictional defect cannot be cured retroactively. To support this claim, the defendants rely on Fairchild Heights Residents Assn., Inc. v. Fairchild Heights, Inc. , 131 Conn. App. 567, 574 n.8, 27 A.3d 467 (2011) ("[t]he lack of subject matter jurisdiction ... cannot be cured retrospectively" [internal quotation marks omitted] ), rev'd in part on other grounds, 310 Conn. 797, 82 A.3d 602 (2014), and Connecticut Associated Builders & Contractors v. Hartford , 251 Conn. 169, 186, 740 A.2d 813 (1999) (determining subject matter jurisdiction on basis of facts at time that original complaint was filed). We conclude that these cases are distinguishable.
In Fairchild Heights Residents Assn., Inc. , the plaintiff claimed that the defendant had violated various provisions of General Statutes § 21-82 (a) governing, inter alia, a landlord's responsibilities in operating a mobile home park. See Fairchild Heights Residents Assn., Inc. v. Fairchild Heights, Inc. , supra, 131 Conn. App. at 574, 27 A.3d 467. The defendant claimed on appeal that the trial court lacked subject matter jurisdiction because the plaintiff had failed to exhaust its remedies pursuant to a statutory scheme for addressing complaints related to mobile home parks. Id., at 571, 576, 27 A.3d 467. The Appellate Court agreed. Id., at 577, 27 A.3d 467. In a footnote, the Appellate Court noted that, although the trial court had tried the case on the basis of the plaintiff's amended complaint, "[t]he operative complaint for jurisdictional purposes is that included with the writ of summons. The lack of subject matter jurisdiction to render a final judgment cannot be cured retrospectively." (Internal quotation marks omitted.) Id., at 574 n.8, 27 A.3d 467.
In Connecticut Associated Builders & Contractors v. Hartford , supra, 251 Conn. at 171, 740 A.2d 813, the named plaintiff, a trade association, and two plaintiff subcontractors, **685 claimed that the defendant's procedures for bidding on a municipal construction contract violated various state and local statutes as well as the state and federal constitutions. Id. This court concluded that the subcontractors lacked standing because the statutes on which they relied were designed to protect the public, not bidders. Id., at 184, 740 A.2d 813. This court also concluded that the trade association lacked standing because none of its members would have had standing to challenge the bidding procedures "[a]t the time of the filing of the complaint ...." Id., at 186, 740 A.2d 813.
Thus, Fairchild Heights Residents Assn., Inc. v. Fairchild Heights, Inc. , supra, 131 Conn. App. at 574, 27 A.3d 467, and Connecticut Associated Builders & Contractors v. Hartford , supra, 251 Conn. at 169, 740 A.2d 813, are distinguishable *49 from the present case because, in both of those cases, the original complaint should have been dismissed because no plaintiff had standing. If the trial court had rendered a judgment of dismissal in those cases, the plaintiffs would not have been permitted to cure the jurisdictional defects with subsequent pleadings because there no longer would have been any pending action in which to file them. In contrast, the original complaint in the present case was not dismissed when the trial court initially determined that the Coalition lacked standing because the individual plaintiffs named in the original complaint still had standing as parents of students in Connecticut schools. Accordingly, the sole effect of dismissing the Coalition's claims was to remove the Coalition as a plaintiff. When the Coalition subsequently gained associational standing to raise the claims, however, we can perceive no reason why it would not have been permitted to join the action as a plaintiff pursuant to Practice Book § 9-3, assuming, of course, that it satisfied all prongs of the Worrell test.[20] **686 We conclude, therefore, that it would elevate form over substance to hold that the trial court improperly allowed the plaintiffs to cure the jurisdictional defect with respect to the Coalition's claims by amending the complaint. The defendants have not explained how allowing the plaintiffs to amend their complaint, instead of requiring the Coalition to file a motion to join the action as a plaintiff, could have allowed the plaintiffs to reap any procedural advantage or caused any detriment to the defendants. Accordingly, we reject the defendants' claim that the Coalition lacks associational standing under the first prong of Worrell because none of its members had standing to bring this action in their own right when the original complaint was filed.
2
Second Prong of the Worrell Test
The defendants also claim that the Coalition fails the second prong of the Worrell associational standing test, i.e., that "the interests [that the Coalition] seeks to protect are germane to the organization's purpose"; Connecticut Assn. of Health Care Facilities, Inc. v. Worrell , supra, 199 Conn. at 616, 508 A.2d 743 ; because "its membership is irremediably riddled with inherent conflicts regarding educational policy issues germane to this case." Specifically, **687 the defendants claim that the Coalition's membership includes, among others, municipalities and local school boards with diverse locations and demographics, teachers' unions and parents. The defendants contend that, although all members might agree on one *50 point-the need for the state to put more money into the educational system-they would not agree on how the money should be distributed. The defendants point out that potential changes in funding that would benefit one school district might harm another district. The defendants also point out that one member of the Coalition, the Connecticut Association of Public School Superintendents, is opposed to laws governing binding arbitration for teacher pay. According to the defendants, this position is squarely at odds with the interests of the two teachers' unions that are members of the Coalition. As another example, the defendants point out that one member of the Coalition, the city of Bridgeport, has taken the position through the testimony of its superintendent of schools that teacher termination laws and due process requirements should be changed to make it easier to terminate ineffective administrators and teachers, a position with which the teachers' unions also would disagree. We conclude that these potential conflicts do not deprive the Coalition of associational standing.
As noted by the United States Court of Appeals for the Seventh Circuit, courts "have not been uniform in their approach to the presence of conflicts of interest in an association seeking standing." Retired Chicago Police Assn. v. Chicago , 7 F.3d 584, 603 (7th Cir. 1993). Specifically, some courts have concluded that conflicts among the members of an association are simply "not relevant to whether associational standing ought to be permitted"; id., at 603-605 (discussing cases); while other courts have concluded that, under certain circumstances, conflicts of interest may be so profound as to **688 deprive the association of standing. Id., at 605-607 (discussing cases).[21]
The courts that have held that conflicts of interest among members of an association generally do not deprive the association of standing have relied on the decision of the United States Supreme Court in International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock , 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) ( Brock ). See, e.g., *51 Retired Chicago Police Assn. v. Chicago , supra, 7 F.3d at 603-605 (discussing cases). In Brock , the court acknowledged that the position taken by an association in a particular litigation "might reflect the views of only a bare majority-or even an influential minority-of the full membership." Brock , supra, at 289, 106 S.Ct. 2523. Nevertheless, the court concluded that the potential for **689 a conflict of interest was outweighed by the benefits provided by associational standing, namely, that many associations have "a [preexisting] reservoir of expertise and capital" upon which its members can draw and that associations provide people with "an effective vehicle for vindicating interests that they share with others." Id., at 289-90, 106 S.Ct. 2523. In addition, the court in Brock noted that any harm to a member of an association who did not agree with the position taken by the association would not be irremediable because, if an association is not "able to represent adequately the interests of all their injured members," a judgment won by the association "might not preclude subsequent claims by the association's members without offending due process principles." Id., at 290, 106 S.Ct. 2523 ; see also Retired Chicago Police Assn. v. Chicago , supra, at 605 (summarizing authority from United States Third Circuit Court of Appeals that when there is no evidence that position taken by association is "contrary to the interests of a majority of its members, and there [is] nothing on the record to indicate that [the association] had failed to follow [its] own internal rules before joining the litigation, [a] perceived conflict of interest [does] not bar associational standing"); Humane Society of the United States v. Hodel , 840 F.2d 45, 56 (D.C. Cir. 1988) (If "forces that cause individuals to band together guarantee some degree of fair representation, they surely guarantee as well that associational policymakers will not run roughshod over the strongly held views of association members in fashioning litigation goals.... [The germaneness test] requires ... that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." [Footnote omitted; internal quotation marks omitted.] ); National Maritime Union of America, AFL-CIO v. Commander, Military Sealift Command , 824 F.2d 1228, 1234 (D.C. Cir. 1987) ("the mere fact of conflicting interests among members **690 of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members"); Laflamme v. New Horizons, Inc. , 605 F.Supp.2d 378, 396-97 (D. Conn. 2009) (same).
Other courts, however, have recognized that there may be circumstances under which conflicts among the members would deprive an association of standing. For example, the United States Court of Appeals for the Fourth Circuit has held that an association lacks associational standing when "conflicts of interest among members of [an] association require that the members must join the [action] individually in order to protect their own interests" by taking a position adverse to that taken by the association, and the association initiated the litigation without first informing its membership. Maryland Highways Contractors Assn., Inc. v. Maryland , 933 F.2d 1246, 1252-53 (4th Cir.), cert. denied, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991). Similarly, the United States Court of Appeals for the Seventh Circuit has held that an association lacked associational standing when it was "in effect suing certain of its members on behalf of other members." Retired Chicago Police Assn. v. Chicago , supra, 7 F.3d at 606, citing Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Assn. , 830 F.2d 1374, 1381 (7th Cir. 1987). As noted by the *52 court in Retired Chicago Police Assn. v. Chicago , supra, at 606, in both of these cases "the conflict of interest among the members was profound. In Maryland Highways [Contractors Assn., Inc. ], the [action] not only worked to the direct detriment of the minority members of the [a]ssociation, but was undertaken by the [a]ssociation without observance of its own [bylaws]. In Southwest Suburban [Board of Realtors, Inc. ], [the court] noted that 'what this [action] amounts to is [the association bringing an **691 action against] certain of its members on behalf of other of its members.' " In addition, in both cases, "the associations were not really operating along the lines for which they had been organized. In each case, they were operating as less permanent structures merely for litigation purposes and not for the purposes stated in their charters." Id., at 607.
With these principles in mind, we address the defendants' claim in the present case that the conflicts of interest among the Coalition's members deprive it of associational standing. Although the defendants' claim highlights the immense complexity of the state's educational system and the wide variety of interests that the state must consider when formulating educational policies-circumstances that certainly support the notion that courts have very limited institutional competence to craft educational remedies for the types of claims raised in the present case and, therefore, must be extremely cautious when inserting themselves into this area-we conclude that the conflicts of interests among the Coalition's members are not so profound as to deprive the Coalition of associational standing. There is no evidence that a majority of the Coalition's members disagrees with the Coalition's claim that the defendants have deprived students in the state's poorer school districts with a suitable and substantially equal educational opportunity in violation of article eighth, § 1, and article first, §§ 1 and 20; the Coalition's primary litigation goal is not directly at odds with the interests of part of its membership; no members objected to the Coalition initiating this action; no member of the Coalition has expressed the belief that the relief sought by the plaintiffs in this action would not be generally beneficial to the state's educational system; there is no evidence that any member has challenged or intends to challenge the Coalition's claims in this litigation in **692 court;[22] there is no evidence that the Coalition is operating for the purposes other than those stated in its bylaws;[23] and there is no claim that the *53 Coalition brought this litigation without first informing its members or following the procedures in its own bylaws. In the absence of any such evidence, any harm resulting to any member of the Coalition as the result of this litigation would be simply "part of the cost of obtaining the benefits of the association." (Internal quotation marks omitted.) Retired Chicago Police Assn. v. Chicago , supra, 7 F.3d at 604. Accordingly, we reject this claim.
3
Third Prong of the Worrell Test
The defendants next contend that the plaintiffs cannot satisfy the third prong of the Worrell test, i.e., that "neither the claim asserted nor the relief requested requires the participation of individual members in the **693 [action]." (Internal quotation marks omitted.) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell , supra, 199 Conn. at 616, 508 A.2d 743. Specifically, the defendants contend that a court cannot determine whether the individual members of the Coalition "have been denied their constitutional right to a substantially equal and minimally adequate public education without considering specific evidence as to those individuals." According to the defendants, this is so because "[t]he minimum services needed for a precocious reader, an 'average' student, a multiply handicapped student, a student from a troubled home life, a student whose native language is not English, a student with mild cognitive impairment, or any other student, are plainly all different."
We disagree that the plaintiffs have not satisfied the third prong of the Worrell test. Nothing in Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 320, 990 A.2d 206, suggests that the determination as to whether the state is providing a minimally adequate educational opportunity that complies with article eighth, § 1, must be made on a student by student basis, taking into consideration the special needs and abilities of each individual. To the contrary, the Campaign I criteria that Justice Palmer adopted focus exclusively on the characteristics of schools ; id., at 342, 990 A.2d 206 (Palmer, J. , concurring in the judgment) (citing Campaign I criteria); and he emphasized that the focus of the court's inquiry should be on educational inputs, not individual achievement. Id., at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment). Accordingly, as we have already explained in part I A of this opinion, injury to all individual students could be inferred from proof that the state's schools do not meet the Campaign I criteria even in the absence of evidence that each individual student has suffered some identifiable harm. Accordingly, we reject this claim.
**694 II
WHETHER THE TRIAL COURT APPLIED AN IMPROPER CONSTITUTIONAL STANDARD TO THE PLAINTIFFS' CLAIMS PURSUANT TO ARTICLE EIGHTH, § 1
We next address the defendants' claim that the trial court, after determining that plaintiffs did not establish that the state has failed to provide children in any school district in this state with a minimally adequate educational system under the Campaign I criteria, improperly applied a constitutional standard of its own devising to conclude that the defendants have violated the plaintiffs' rights under article eighth, § 1. The plaintiffs disagree and argue that, if we agree with the defendants' claim, the trial court's interpretation of the Campaign I criteria nonetheless was unduly narrow. We agree with the defendants and *54 conclude that the trial court properly interpreted and applied the Campaign I criteria adopted by Justice Palmer in his concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , but then went on to improperly apply a constitutional standard of its own devising.
A
We begin with the standard of review. The scope of the right guaranteed by article eighth, § 1, is a question of law subject to plenary review. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 270-71, 990 A.2d 206 (plurality opinion) (considering scope of right guaranteed by article eighth, § 1, as matter of law); id., at 342-43, 990 A.2d 206 (Palmer, J. , concurring in the judgment) (same).
As we have previously explained herein, the trial court concluded after a trial that the Campaign I criteria for a minimally adequate system of free public **695 schools were met. The trial court also concluded, however, that the state's educational system would not satisfy article eighth, § 1, unless the state "deploy[ed] in its schools resources and standards that are rationally, substantially and verifiably connected to teaching children." The trial court apparently derived this standard from Justice Palmer's statements that the state's educational programs and policies would be unconstitutional if they were "so lacking as to be unreasonable by any fair or objective standard"; Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 321, 990 A.2d 206 (Palmer, J. , concurring in the judgment); and that the state must operate "within the limits of rationality ...." (Internal quotation marks omitted.) Id., at 336, 990 A.2d 206 (Palmer, J. , concurring in the judgment). The trial court concluded that this "rationality" requirement could not be the low rational basis standard because this court had held in Horton I , supra, 172 Conn. at 646, 376 A.2d 359, that "in Connecticut the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized." Applying this "rationally, substantially and verifiably connected" standard, the trial court concluded that the state's current "school program" is unconstitutional because "[the state] has no rational, substantial and verifiable plan to distribute money for education aid and school construction," it has no "objective and mandatory statewide graduation standard," "there is no way to know who the best teachers are and no rational and substantial connection between their compensation and their effect on teaching children," and the state's program of special education spending is irrational.
The defendants claim on appeal that, once the trial court concluded that the Campaign I criteria were met, that court should have concluded that the state's educational system does not violate article eighth, § 1, and it should not have gone on to consider whether the state **696 "deploy[ed] in its schools resources and standards that are rationally, substantially and verifiably connected to teaching children." We agree. We conclude that Justice Palmer's statements that the state's educational programs and policies cannot be "so lacking as to be unreasonable by any fair or objective standard" and that the state must operate "within the limits of rationality" mean that the efforts that the state makes to comply with its obligations under article eighth, § 1, must reasonably address the minimal educational needs of the state's students, as described in Campaign I , and that the standard applied by the trial court is inconsistent with Justice Palmer's repeated statements that courts *55 are ill equipped to address the complex and intractable problems of financing and managing a statewide public school system. (Internal quotation marks omitted.) Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 321, 326, 336, 990 A.2d 206 (Palmer, J. , concurring in the judgment). We further conclude that, having found that the schools are minimally adequate under the Campaign I criteria, the trial court should have determined that the state has fulfilled its obligations under article eighth, § 1, and, therefore, the trial court improperly applied the "rationally, substantially and verifiably connected to teaching children" standard to conclude that the state's educational system is unconstitutional.
As we have indicated, under the Campaign I standard, the state must provide (1) "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn," (2) "minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks," (3) "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies," and (4) "sufficient personnel adequately trained to teach **697 those subject areas." Campaign I, supra, 86 N.Y.2d at 317, 631 N.Y.S.2d 565, 655 N.E.2d 661.[24] Inasmuch as the phrase "minimally adequate" is not self-defining, a trial court making the determination as to whether this standard has been met necessarily is required to exercise some degree of judgment. It is reasonable to conclude, therefore, that Justice Palmer's statements that the state must operate "within the limits of rationality"; (internal quotation marks omitted) Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 336, 990 A.2d 206 (Palmer, J. , concurring in the judgment); and that the educational opportunity provided by the state cannot be "so lacking as to be unreasonable by any fair or objective standard"; id., at 321, 990 A.2d 206 (Palmer, J. , concurring in the judgment); meant simply that the trial court should determine whether the specific educational facilities, instrumentalities, curricula and personnel that the state is required to provide, as described in Campaign I, reasonably address the minimal educational needs of this state's children, that is, whether the state's offerings are sufficient to enable a student who takes advantage of them **698 to become a *56 functional member of society.[25] For example, if the plaintiffs had shown that the state was providing elementary school students with books and curricula intended for only advanced college students, a court could conclude that the state was not reasonably meeting the minimal educational needs of these students-in other words, that these instrumentalities and curricula were not minimally adequate. Similarly, if no reasonable person could conclude that a single heat lamp is sufficient to heat a classroom during the winter, a school that routinely used this heating method would not be minimally adequate.
Justice Palmer never suggested, however, that, after determining that the specific instrumentalities, facilities, curricula and personnel that the state is required to provide in its elementary and secondary schools reasonably address the minimal educational needs of their students, the courts must nevertheless examine all of **699 the state's educational policies and programs, such as its funding formulas, school construction policies, graduation standards, teacher evaluation practices, teacher compensation practices and special education policies, to ensure that they are "rationally, substantially and verifiably connected to teaching children." Rather, if the state is providing a minimally adequate educational opportunity to all of its elementary and secondary school students under the Campaign I criteria, the fact that some educational policies and programs are not, in the trial court's personal view, "rationally, substantially and verifiably connected to teaching children" is constitutionally irrelevant. For example, if a court concludes that the state's educational system satisfies the Campaign I criteria, the fact that the state spends large sums of money on special education that, in the court's personal view, would be better spent on hiring teachers for regular classrooms is no more relevant than the fact that the state spends large sums of money on its Medicaid program or on road construction. It is irrefutable that the court's role is not to determine how programs should be funded, both within the educational system and beyond, but, instead, only to ensure that the state is meeting the minimal constitutional requirements for education.
Indeed, Justice Palmer expressly recognized that "courts are ill equipped to deal with issues of educational policy" and *57 "lack [the] specialized knowledge and experience to address the many persistent and difficult questions of educational policy that invariably arise in connection with the establishment and maintenance of a statewide system of education." (Internal quotation marks omitted.) Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 335, 990 A.2d 206 (Palmer, J. , concurring in the judgment). Thus, the constitutional standard that the trial court applied in the present case would entangle the courts in the very policy **700 determinations that Justice Palmer repeatedly warned against,[26] thereby creating a very substantial likelihood that the court would violate constitutional separation of powers principles. See id., at 314, 990 A.2d 206 (plurality opinion), quoting Campaign for Fiscal Equity, Inc. v. State , 8 N.Y.3d 14, 27-28, 861 N.E.2d 50, 828 N.Y.S.2d 235 (2006) ("[t]he role of the courts is not ... to determine the best way to calculate the cost of a sound basic education ... but to determine whether the [s]tate's proposed calculation of that cost is rational" because of "limited access of the [j]udiciary to the controlling economic and social facts, but also [because of] our abiding respect for the separation of powers upon which our system of government is based" [internal quotation marks omitted] ); see also Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 326, 990 A.2d 206 (Palmer, J. , concurring in the judgment), quoting R. Levy, " Gunfight at the K-12 Corral: Legislative vs. Judicial Power in the Kansas School Finance Litigation," 54 U. Kan. L. Rev. 1021, 1033-34 (2006) ( "Defining levels of adequacy requires that courts become involved in determining educational policies-the goals and the methods of delivering education-in a way that equity litigation does not. Likewise, fashioning remedies for violations of adequacy requirements is more problematic because legislatures may be reluctant to provide sufficient funding and because judicial enforcement of remedies against the legislature presents practical difficulties and raises serious [separation of powers concerns]."); Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 338, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("the significant separation of powers issues that [crafting a judicial remedy for a violation of article eighth, § 1] invariably would **701 spawn must be given due consideration in determining the scope of the right").
Relatedly, requiring courts to determine, as an issue entirely distinct from the question of whether the state is providing minimally adequate schools under the narrow and specific Campaign I criteria, whether the state's educational policies and programs "are rationally, substantially and verifiably connected to teaching children" would be entirely inconsistent with Justice Palmer's rejection of the plurality's suggestion that it would be appropriate "to craft the constitutional standard 'in broad terms' [because] the broader the standard, the more vague it is likely to be. In addition, the broader the standard, the more difficult it will be for the parties and the court to understand and apply it." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, at 342-43 n.17, 990 A.2d 206 (Palmer, J. , concurring in the judgment). Accordingly, we agree with the defendants that, upon finding that the state's educational system reasonably satisfies the narrow and specific *58 Campaign I criteria, the court should have found that the system is constitutional under article eighth, § 1.
The plaintiffs contend that this conclusion cannot be reconciled with Justice Palmer's suggestion that an "education funding system [that] is 'arbitrary and inadequate,' and not related to the actual costs of providing an education that meets constitutional standards" would be unconstitutional. Id., at 346 n.20, 990 A.2d 206 (Palmer, J. , concurring in the judgment). We conclude, however, that, for the reasons that we have already given, this statement merely supports the notion that state funding must be sufficient to allow schools to meet the minimally adequate Campaign I criteria. Indeed, the plaintiffs ultimately contend in their reply brief to this court that the conclusion that the trial court drew from the evidence should not have been that the state's graduation **702 standards, teacher evaluation and compensation schemes, and spending on special education are irrational, but that "many districts with high needs populations are not receiving adequate resources to provide an adequate educational opportunity to many of their students."[27] Thus, the plaintiffs appear to concede that, to the extent that Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , contained a reasonableness component, that component is part and parcel of the constitutional standard for determining the minimal adequacy of the state's educational offerings and not a separate rationality test applicable to all educational policies and programs, even when the Campaign I criteria have been satisfied. Accordingly, we agree with the defendants that, having found that the educational resources provided by the state reasonably meet the minimal needs of the state's students-that is, the state's educational offerings, even in the poorest school districts, are sufficient to enable students who take advantage of them to become functional members of society-and that the Campaign I criteria were therefore met, the trial court should have concluded that the state's educational system satisfies article eighth, § 1, and it should not have gone on to apply a constitutional standard of its own devising. By doing so, not only did the trial court fail to defer to the legislature, it also usurped the legislative responsibility to determine how additional funding, beyond the constitutionally required minimum, should be allocated and how to craft educational policies that, in its view, best balance the wide variety of interests at issue. This action was in clear violation of separation of powers principles.
B
The plaintiffs claim on cross appeal that, if we agree with the defendants' claim that the trial court improperly **703 applied the "rationally, substantially and verifiably connected to teaching children" standard to conclude that the defendants have violated article eighth, § 1, we should also determine that the trial court's interpretation of the Campaign I criteria was unduly narrow. We disagree.
The plaintiffs contend that the subsequent history of the Campaign I case shows that the court in Campaign I contemplated a far broader standard than the trial court applied in this case. The plaintiffs point out that, after the court in Campaign I remanded the case for application of the standard that it had adopted, the trial court conducted a searching and detailed examination of New York City's educational system and concluded that the Campaign I standard was not met. See *59 Campaign for Fiscal Equity, Inc. v. State , 187 Misc. 2d 1, 4, 719 N.Y.S.2d 475 (2001) ( Campaign II ).[28] The New York Court of Appeals ultimately upheld the trial court's determination on appeal. **704 Campaign for Fiscal Equity, Inc. v. State , 100 N.Y.2d 893, 903, 801 N.E.2d 326, 769 N.Y.S.2d 106 (2003) ( Campaign III ) (affirming portion of decision of Appellate Division of the New York Supreme Court dismissing plaintiffs' "title VI"[29] claim and reversing portions of order finding error in Campaign II ). The plaintiffs contend that this shows that the Campaign I standard demands the type of searching and detailed analysis that the New York Court of Appeals approved in Campaign III.
We are not persuaded. Rather, a review of the subsequent history of Campaign I shows why Justice Palmer's concurring opinion did not contemplate that the trial court would apply the broader standard that the New York trial court applied in Campaign II. The trial court in Campaign II considered on remand a broad range of factors that were not specifically mentioned in Campaign I. See footnote 28 of this opinion. The trial court also applied a comparative standard, repeatedly considering whether the educational instrumentalities, facilities, curricula and personnel provided by New York City schools were equivalent to those provided elsewhere in the state,[30] despite the fact that nothing in **705 *60 Campaign I had suggested that, in determining whether New York City's school system was minimally adequate, the trial court should consider the level of resources provided by other school districts.
Moreover, the trial court in Campaign II was not persuaded by the state's contention that it was "required only to provide the opportunity for a sound basic education" and that "students' failure to seize this opportunity is a product of various socioeconomic deficits experienced by the large number of [at risk] students in New York City public schools." (Emphasis in original.) Campaign II, supra, 187 Misc.2d at 63, 719 N.Y.S.2d 475. The court stated that "the [s]tate must only provide the opportunity for a sound basic education, but this opportunity must be placed within reach of all students. The court rejects the argument that the [s]tate is excused from its constitutional obligations when public school students present with socioeconomic deficits."[31] Id. Thus, the standard that the trial court applied in Campaign II, which was implicitly approved by the New York Court of Appeals in Campaign III, was clearly a different and far broader standard than the one set forth in Campaign I.
We see no evidence in Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , that he contemplated that the narrow and specific criteria that he had identified for determining whether the state is providing minimally adequate educational resources would be subject to modification on remand. To the contrary, he repeatedly emphasized that a broader standard was inappropriate, that the trial court should give great deference to the **706 legislature's educational policy choices, and that the court's primary focus should be on the adequacy of educational inputs, not on the level of educational achievement. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 342 n.17, 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment). Moreover, unlike the justices in the plurality, Justice Palmer made no direct reference to the subsequent history of Campaign I in his concurring opinion. See id., at 302, 990 A.2d 206 (plurality opinion) ( Campaign III"further developed [the Campaign I ] standard to provide that students have a right to a meaningful high school education, one which prepares them to function productively as civic participants, although not necessarily a high school diploma" [internal quotation marks omitted] ). Indeed, Justice Palmer expressly rejected the part of the plurality's standard that, like Campaign III, focused on educational outputs. See id., at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment). We conclude, therefore, that, at least initially, the trial court properly determined that the narrow and specific Campaign I standard, as set forth in Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 342, 990 A.2d 206, is the controlling *61 constitutional standard, not the broader standard that the New York courts applied in Campaign II and Campaign III.
The plaintiffs also contend that the standard applied by the trial court was too narrow because Justice Palmer recognized that the Campaign I criteria "must be evaluated in light of current educational standards, which continue to evolve." See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 320-21, 990 A.2d 206 (Palmer, J. , concurring in the judgment) (educational opportunity provided by state pursuant to article eighth, § 1, must be "minimally adequate by modern educational standards"). In our view, however, **707 this statement simply means that the fact that a school would be minimally adequate under 1850 educational standards does not necessarily mean that it is minimally adequate under modern standards. In other words, the fact that a school with a single classroom containing forty students ranging in age from six to eighteen, heated by a wood stove, and providing only handheld chalkboards for instruction may have been considered adequate in 1850 does not mean that the school would be adequate today.
The plaintiffs further rely on Justice Palmer's suggestion that their allegations that "many [students] attend schools that do not have the resources necessary to educate their high concentration of poorly performing students" and that "the state has failed to provide the resources necessary to intervene effectively on behalf of [at risk] students, that is, students who, because of [a] wide range of financial, familial, and social circumstances, [are] at greater risk of failing or experiencing other unwanted outcomes unless intervention occurs" were sufficient to withstand a motion to strike because, if proven, they might establish "a violation of the standard articulated in this opinion." (Internal quotation marks omitted.) Id., at 346 n.20, 990 A.2d 206 (Palmer, J. , concurring in the judgment). Because these allegations focus on the special needs of at risk students and on educational outcomes, the plaintiffs contend, Justice Palmer must have intended for the trial court to consider those factors.
This interpretation simply cannot be squared, however, with Justice Palmer's unequivocal statement elsewhere in his opinion that schools "cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder [s] the academic achievement of those students." (Internal quotation marks omitted.) Id., at 345, 990 A.2d 206 (Palmer, J. , concurring **708 in the judgment). In addition, although Justice Palmer was reluctant to conclude that "educational 'outputs' are never relevant to the determination of whether the state has complied with the requirements of article eighth, § 1"; (emphasis added) id., at 345 n.19, 990 A.2d 206 ; he clearly indicated that "because student achievement may be affected by so many factors outside the state's control, including, perhaps most particularly, the disadvantaging characteristics of poverty ... educational inputs must provide the primary basis for that determination."[32] (Citation omitted; internal *62 quotation marks omitted.) Id. (Palmer, J. , concurring in the judgment). Indeed, to conclude otherwise would convert the constitutional mandate that the state provide minimally adequate elementary and secondary schools into a mandate that the state ensure that all school age children have sufficiently good parenting, financial resources, housing, nutrition, health care, clothes and other social goods to enable them to take advantage of the educational opportunity that the state is offering.
We are compelled to conclude, therefore, that when Justice Palmer determined that the plaintiffs' allegations were sufficient to withstand the defendants' motion to strike, he did not intend to suggest that the Campaign I criteria were merely one part of a broader constitutional inquiry that should include an analysis of whether the state's educational offerings are sufficient to overcome disadvantaging conditions outside of the state's control that affect educational outcomes.
**709 Rather, he was recognizing that the allegations were sufficiently broad and general that the evidence that the plaintiffs presented to support them at trial might support a conclusion that the narrow and specific Campaign I criteria had not been met.[33] See id., at 346 n.20, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("[t]he plaintiffs have asserted extensive factual allegations ... and their claims are cast in broad terms"). Indeed, because Justice Palmer had articulated the controlling constitutional standard for the first time in his concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , it would have been unfair to the plaintiffs to refuse to afford them an opportunity to refine their claims to meet the standard. Cf. Cefaratti v. Aranow , 321 Conn. 593, 625, 141 A.3d 752 (2016) ("[b]ecause we have adopted the detrimental reliance standard for the first time in this opinion ... we believe that fairness requires us to remand the case to the trial court so that the plaintiff may have an opportunity to present evidence" that would satisfy new standard). Accordingly, we conclude that the trial court initially applied the proper standard when it concluded that the state's educational offerings satisfy the minimal constitutional standard set forth in Justice Palmer's **710 concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc.
Finally, to the extent that the plaintiffs contend that, even if the Campaign II standard does not apply, the trial court failed to apply the Campaign I criteria properly because it did not consider whether the state's educational offerings reasonably address the minimal educational needs of the state's children, we disagree. As we have explained, it is implicit in the Campaign I standard that the educational *63 opportunities offered by the state must be sufficient to enable a student who takes advantage of them to attain a level of knowledge of reading, writing, mathematics, science, and social studies that will, in turn, enable the student to perform the basic functions of an adult in our society.[34] See footnote 25 of this opinion. There simply is no sense in which a teacher providing instruction pursuant to a particular curriculum under particular classroom conditions could be considered a minimally adequate educational opportunity if the teacher, the curriculum or the conditions were not sufficient to enable a student who attends to the instruction to obtain a minimally adequate education. In turn, there is no sense in which an education can be considered minimally adequate if a person who has acquired that level of education is unable to perform the basic functions of an adult. Accordingly, the trial court's finding that the state's educational offerings satisfy the Campaign I criteria for a minimally adequate educational opportunity necessarily encompassed a finding that those educational offerings reasonably address the minimal educational needs of the state's children.[35] **711 The dissent disagrees, and would conclude that the trial court improperly applied the Campaign I criteria. In support of this conclusion, the dissent claims that (1) although the Campaign I criteria are necessary components of a minimally adequate educational opportunity, the trial court improperly assumed that, if satisfied, the criteria are sufficient to establish a minimally adequate educational opportunity; (2) the trial court failed to consider whether the state is making an effort "to ensure that [the minimal educational offerings required by Campaign I ] are designed to address the basic educational needs of at risk learners in underprivileged communities"; (3) the trial court improperly stripped out "rationality review" from its Campaign I analysis; (4) the trial court improperly assessed the Campaign I criteria on a statewide basis, instead of at the school district or school level; and (5) the trial court failed to consider whether the poor educational outcomes in the neediest school districts are "the result of specific deficient educational inputs, or [have been] caused by factors not attributable to, or capable of remediation by, state action or omission ...." (Internal quotation marks omitted.)
These claims, however, simply cannot be reconciled with Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 320, 990 A.2d 206. With respect to the dissent's claim that satisfaction of the Campaign I criteria is necessary, but not sufficient, to establish a constitutionally **712 adequate educational *64 opportunity, Justice Palmer could not have been clearer in his concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , that the constitutional standard to be applied by the courts should not be broad and vague, but must be narrow and specific. See id., at 342 n.17, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("I disagree with the plurality that it is appropriate to craft the constitutional standard 'in broad terms.' In my view, the broader the standard, the more vague it is likely to be. In addition, the broader the standard, the more difficult it will be for the parties and the court to understand and apply it. I also disagree with the plurality's suggestion that a broad standard is beneficial because it may be 'refined and developed further' at trial. Although some constitutional standards must be defined in broad terms because of the applicability to a vast number of fact patterns, this is not such a case; for purposes of a case like the present one, in which it is critically important to give as much guidance to the court and the parties as possible, the more clearly defined the standard, the better."). The dissent's claim in the present case is entirely inconsistent with these principles; a standard that fails to specify all of the criteria that must be met in order to establish that the state's educational offerings meet the constitutional minimum is neither narrow nor specific. Accordingly, we conclude that the trial court properly determined that, if the Campaign I criteria are satisfied, the state's educational offerings are not constitutionally inadequate.
With respect to the dissent's claim that the trial court failed to consider whether the state's educational offerings are "designed to address the basic educational needs of at risk learners in underprivileged communities," the dissent has failed to explain why the courts must make this determination when it agrees that they are barred from requiring the state either "to overcome **713 every serious social and personal disadvantage that students bring with them to school"; Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 344-45, 990 A.2d 206 (Palmer, J. , concurring in the judgment); or to guarantee good educational outcomes. See id., at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("[p]erformance or achievement of the student population, taken generally, cannot ... be the principle [on] which [a constitutionally required minimally adequate education] is based," rather, "obligation to provide a minimally adequate education must be based generally, not on what level of achievement students reach, but on what the state reasonably attempts to make available to them" [internal quotation marks omitted] ). As Justice Palmer repeatedly emphasized in Connecticut Coalition for Justice in Education Funding, Inc. , courts have little institutional competence to make the determination as to which disadvantaging conditions are the most serious or how and to what extent those conditions should be alleviated by the state. See footnote 26 of this opinion. Moreover, it is difficult to imagine a broader or vaguer standard than whether the state's educational offerings are "designed to address the basic educational needs of at risk learners in underprivileged communities." We conclude, therefore, that this standard is not encompassed by the narrow and specific Campaign I criteria.
In any event, even if this were the proper standard, the trial court expressly found that there are numerous state and federal programs that are designed to provide needy students with "breakfast, lunch, and many times food to take home," even during the summer months when school is not in session, to provide parental education, to address the needs of homeless *65 students, to prevent sexually transmitted diseases, to address the needs of students who are parents as well as pregnant students, and to provide mental health programs. The **714 court concluded that the existence of these programs shows that "the state is devoting to needy schools a great deal more in resources than is required by the modest standard [set forth in Campaign I ]." As we conclude in part III of this opinion, we see nothing in the record that would compel a different conclusion, and the dissent provides no guidance on the nature or quantity of the additional resources that the state would be required to devote to needy students in order to meet the dissent's new standard.
The dissent also claims that the trial court stripped "rationality review" from its analysis pursuant to Campaign I. For the reasons that we have already explained, we disagree. We further disagree with the dissent's claim that "there is no indication that the court considered any of [the specific factual findings that the plaintiffs rely on] ...." We decline to presume that the trial court made 1060 specific factual findings, filling 157 single-spaced pages, only to then conclude that the findings were completely irrelevant to its legal analysis.[36]
We also disagree with the dissent's contention that the trial court improperly applied the Campaign I criteria on a statewide basis instead of determining on a school by school or school district by school district basis whether the state's educational offerings are constitutionally adequate. As we have already explained at length, the trial court made copious factual findings regarding conditions in specific schools and school districts and expressly found that the state is meeting its **715 constitutional obligations in the poorest and neediest schools.[37]
Finally, the dissent contends that, in applying the constitutional standard, the trial court was required "first [to determine] whether students have in fact been unable to obtain a minimally adequate education" and then to consider whether any poor educational outcomes that the court discovered were " 'the result of specific deficient educational inputs, or [have been] caused by factors not attributable to, or capable of remediation by, state action or omission ....' "[38] This is yet another variation on the theme that the trial court was *66 required to consider educational outcomes as part of its Campaign I analysis, a theme that is completely discordant with the overall tenor of Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , in which he emphasized that the trial court's focus must be on inputs. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring **716 in the judgment). If the court determines that educational inputs are minimally adequate to enable a student who takes advantage of them to perform the basic functions of an adult, it necessarily follows that poor outcomes must be caused by disadvantaging factors for which the court has no authority to order a remedy under the guise of enforcing the educational guarantee embodied in article eighth, § 1. That is the very rationale for limiting the trial court's consideration to inputs. Indeed, even the plurality opinion in Connecticut Coalition for Justice in Education Funding, Inc. , on which the dissent relies instead of Justice Palmer's controlling opinion, expressly recognized that article eighth, § 1, "is not a panacea for all of the social ills that contribute to many of the achievement deficiencies identified by the plaintiffs"; id., at 320, 990 A.2d 206 (plurality opinion); and declined to take any stand on the question of the extent to which the trial court could consider outputs, if at all. See id., at 318 n.60, 990 A.2d 206 (plurality opinion). Accordingly, we emphatically reject the dissent's suggestion that the "evaluation of educational outputs will, in many instances, be a fundamental and necessary starting point in evaluating claims brought under article eighth, § 1," and that "outcomes provide the clearest evidence of whether Connecticut's students are in fact receiving a minimally adequate education."
In short, the dissent has adopted a new constitutional standard that is far broader and vaguer than the Campaign I criteria that Justice Palmer adopted in his concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , which is controlling. This new constitutional standard is entirely inconsistent with Justice Palmer's conclusions that the criteria for determining whether the state's schools are minimally adequate must be narrow and specific, that the courts must defer to the educational policy choices of the political branches, that the state is not constitutionally **717 required to overcome all disadvantages that students bring with them to school and that courts have little institutional competence to address the intractable and complex questions that arise in the area of educational policy. We believe that, to the contrary, because the role of the court is to apply the precedent on which the parties and the trial court reasonably relied, the narrow and specific Campaign I criteria that Justice Palmer outlined in his concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , provide the correct constitutional standard, and we conclude that the trial court properly applied that standard.
III
PLAINTIFFS' CLAIM THAT THE TRIAL COURT IMPROPERLY CONCLUDED THAT THE EVIDENCE DID NOT SUPPORT THEIR CLAIM THAT THE CAMPAIGN I CRITERIA WERE NOT SATISFIED
The plaintiffs next claim that the trial court improperly concluded that the state has not violated article eighth, § 1, by failing to provide educational resources that comply with the Campaign I criteria adopted by Justice Palmer in his concurring opinion in *67 Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 342, 990 A.2d 206. Specifically, the plaintiffs contend that the trial court's conclusion that the Campaign I criteria have been satisfied cannot be reconciled with the trial court's findings that the school districts with the neediest students have fewer experienced teachers than other districts, shortages of specialist teachers, interventionists and counselors, inadequate classroom facilities, and insufficient quantities of educational technologies and instructional resources. In addition, they claim, the court's conclusion was contradicted by its findings that large numbers of students in poverty and students in high needs districts are not achieving, or even approaching, appropriate educational **718 outcomes as measured by standardized test scores, that classrooms in high needs districts "often" have significantly more students per class than other schools, that high needs districts are unable to provide sufficient "socioemotional and related support services," such as guidance counselors, psychologists, social workers and special education teachers, to their students, and that preschool opportunities are unavailable for large numbers of low income students. The plaintiffs claim that, if the trial court had properly taken these findings into account, it would have been compelled to conclude as a matter of law that the defendants did not satisfy the Campaign I criteria. We disagree.
The plaintiffs' claim involves a question of law subject to plenary review. See Right v. Breen , 277 Conn. 364, 371, 890 A.2d 1287 (2006) (whether trial court was compelled to act in particular fashion as matter of law is subject to plenary review); see also Parker v. Meeks , 96 Conn. 319, 325, 114 A. 123 (1921) (legal conclusion to be drawn from undisputed facts is question of law). Although the judgment of the trial court ordinarily "is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness"; (internal quotation marks omitted) Label Systems Corp. v. Aghamohammadi , 270 Conn. 291, 320, 852 A.2d 703 (2004) ; because the plaintiffs' claim implicates their fundamental right to an education under article eighth, § 1, the trial court's conclusions are subject to the "independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession ... or the seizure of a defendant." (Citations omitted.) State v. Ross , 230 Conn. 183, 259, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S.Ct. 1133, 130 L.Ed. 2d 1095 (1995).
In support of the plaintiffs' claim that the trial court's factual findings cannot be reconciled with its conclusion that the state is providing the neediest schools with **719 constitutionally adequate teachers, classroom facilities, educational technologies and instructional resources, the plaintiffs rely on these court findings: Bridgeport has filled 11.5 teaching positions with permanent substitutes instead of certified teachers; during the 2015-16 school year, New London High School filled four teaching positions by hiring substitute teachers who could teach for only a maximum of forty days, some of whom were not familiar with the subjects that they were assigned to teach; some classrooms in Bridgeport and New Britain are overcrowded, with up to twenty-nine students; East Hartford has allotted zero dollars in its budget for school library books; and Danbury High School has provided zero dollars in its budget for textbooks.[39] *68 We are not persuaded. Although it may be cause for concern that a school district or a school has filled a small number of teaching positions with substitute teachers for a specified period, that fact does not compel the conclusion that the overall level of teaching in the district or school is inadequate. Similarly, although a class size of twenty-nine students might not be ideal for needier students, we are unable to say that classes of that size render a school inadequate as a matter of **720 law. Indeed, the trial court expressly found that the scientific research on the impact of class size on educational outcomes is inconclusive. Finally, the fact that, during particular years, particular schools have no money budgeted for library books or textbooks does not compel the conclusion that those schools lack minimally adequate books.[40]
With respect to the other factual findings relied on by the plaintiffs, such as the findings that there are low test scores in schools with large numbers of poor and needy students and the findings that the state has provided inadequate socioemotional and related support services, specialist teachers, interventionists and preschool opportunities to its poorer students, we conclude that, in contrast to the court's findings regarding the adequacy of teachers, class size, library books and textbooks, these findings do not relate to the narrow Campaign I criteria.[41] See **721 Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("because student achievement may be affected by so many factors outside the state's control, including, perhaps most particularly, the disadvantaging characteristics of poverty ... educational inputs must provide the primary basis for that determination" [internal *69 quotation marks omitted] ); id., at 345, 990 A.2d 206 ("[schools] cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder[s] the academic achievement of those students" [internal quotation marks omitted] ). Rather, the plaintiffs have essentially reiterated the claim that we addressed and rejected in part II B of this opinion, specifically, that the Campaign I criteria are too narrow. Therefore, we must also conclude that these facts do not compel the conclusion that the defendants have violated article eighth, § 1, by failing to provide the plaintiffs with a minimally adequate educational opportunity. Accordingly, we must reject this claim.
IV
PLAINTIFFS' CLAIM THAT THE TRIAL COURT INCORRECTLY CONCLUDED THAT THEIR EQUAL PROTECTION RIGHTS UNDER THE STATE CONSTITUTION HAVE NOT BEEN VIOLATED
Finally, we address the plaintiffs' claim that, contrary to the trial court's determination, the evidence that they presented at trial compels the conclusion that the defendants have violated their rights under the state constitution's equal protection provisions, article first, §§ 1 and 20, by failing to provide a substantially equal educational opportunity to all of the state's schoolchildren.[42] We disagree.
**722 As we previously have indicated herein, the trial court found that, since 2012, the state had funneled "over $400 million in new money" into the state's thirty lowest performing schools. In addition, the state had provided $13 million in financial support to fourteen "failing schools" in 2015, plus $4 million per year for school improvement grants to approximately thirty high needs schools under the state's Alliance District program.[43] Finally, the court noted that there are numerous state and federal programs that are designed to provide meals to needy students, even during the summer, to invite parents into schools to share in learning, to attend to the needs of homeless students, to prevent sexually transmitted diseases, to attend to the needs of young parents and pregnant students, and to provide mental health support. The court found that "[a]ll of this extra spending benefits poor districts but not wealthier districts. It is on top of basic education aid that has a history of strongly favoring poor districts over wealthier ones."
The court concluded that this "tilt" in spending was "fatal to the plaintiffs' equal protection claim .... In [ Horton v. Meskill , 195 Conn. 24, 38, 486 A.2d 1099 (1985) ( Horton II ) ] our Supreme Court held that an equal protection claim based on spending disparities can only succeed if, among other things, any claimant can show that the disparities 'jeopardize the plaintiffs' fundamental right to education.' Unlike the disparities in [ Horton II ], the state's current education spending disparity favors the impoverished districts with which the *70 plaintiffs are most concerned. They can hardly claim **723 [that] getting more money compared to other towns is the cause of their woes." (Footnote omitted.)
The plaintiffs now claim that, in reaching this determination, the trial court failed to properly apply the three part standard that this court adopted in Horton II , supra, 195 Conn. at 38, 486 A.2d 1099. Under that standard, to establish that the state has failed to provide substantially equal educational opportunities to its students in violation of the state constitution's equal protection provisions, the plaintiffs must first "make a prima facie showing that disparities in educational expenditures are more than de minimis in that the disparities continue to jeopardize the plaintiffs' fundamental right to education. If they make that showing, the burden then shifts to the state to justify these disparities as incident to the advancement of a legitimate state policy. If the state's justification is acceptable, the state must further demonstrate that the continuing disparities are nevertheless not so great as to be unconstitutional. In other words ... a school financing plan must, as a whole, further the policy of providing significant equalizing state support to local education.... However, no such plan will be constitutional if the remaining level of disparity continues to emasculate the goal of substantial equality." (Citation omitted; internal quotation marks omitted.) Id. The plaintiffs contend that the undisputed evidence presented at trial compels the conclusion that they have satisfied the first part of Horton II and that the defendants have failed to meet their burden under the second and third parts.
Before addressing this claim, we address the defendants' claim that the trial court properly declined to apply the three part Horton II standard because the plaintiffs failed to establish that they are not receiving a minimally adequate educational opportunity under the Campaign I standard. See id., at 38, 486 A.2d 1099 (plaintiffs "must make a prima facie showing that disparities in educational **724 expenditures are more than de minimis in that the disparities continue to jeopardize the plaintiffs' fundamental right to education " [emphasis added] ) We are not persuaded. The court in Horton II expressly recognized that discrimination among school districts based on wealth is "relative rather than absolute"; (internal quotation marks omitted) id., at 35, 486 A.2d 1099 ; and ultimately concluded that the plaintiffs in that case had met their burden of establishing a prima facie case of de minimis disparities without conducting any analysis as to whether the education that they were receiving was minimally adequate. Id., at 39, 486 A.2d 1099. That approach is consistent with this court's statement in Horton I , supra, 172 Conn. at 645-46, 376 A.2d 359, that "[t]his [c]ourt has never suggested that because some adequate level of benefits is provided to all, discrimination in the provision of services is therefore constitutionally excusable. The [e]qual [p]rotection [c]lause is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities of state action." (Internal quotation marks omitted.) We must conclude, therefore, that the "fundamental right" to education that the court was referring to in Horton II was the right to "a substantially equal educational opportunity." (Emphasis added; internal quotation marks omitted.) Horton II , supra, at 36, 486 A.2d 1099. Accordingly, we emphatically reject the defendants' claim that there can be no equal protection violation if the plaintiffs are receiving a minimally adequate educational opportunity, and we address the merits of the plaintiffs' claim that, under Horton II , the evidence compelled a finding that disparities between *71 the funding of the neediest and the least needy school districts are more than de minimis and are not justified by legitimate public policies.[44] **725 In support of their claim that disparities in per pupil expenditures between schools with large numbers of poor and needy students and other schools are more than de minimis, the plaintiffs rely on undisputed evidence showing that, in 2013, "the ratio between the highest spending town [i.e., Cornwall, with net current education expenditures per pupil of $25,718] and the lowest spending town [i.e., Ellington, with expenditures of $11,180, was] 2.30-squarely in the middle range [that] the ... court [in Horton II ] determined was [not] de minimis." See Horton II , supra, 195 Conn. at 39 n.15, 486 A.2d 1099 (from 1973 through 1984, ratio of educational spending in highest spending town to spending in lowest spending town ranged from low of 2.14 in 1980-81 school year to high of 2.45 in 1977-78 school year). In addition, the plaintiffs contend, the undisputed evidence showed that the ratio of education spending in the ninety-fifth percentile town ranked by "equalized net grand list per capita," Cornwall, to education spending in the fifth percentile town, West Haven, was $25,718 to $12,157, or 2.12, much worse than the same ratio for any year considered by the court in Horton II. See id. (highest ratio from 1973 through 1984 was 1.87 and lowest was 1.68). Because the court in Horton II concluded that the plaintiffs had established more than de minimis disparities in educational spending sufficient to satisfy the first part of the constitutional standard, the plaintiffs contend, they also necessarily satisfied the first part. **726 We are not persuaded. The plaintiffs in the present case are not claiming, as the plaintiffs did in Horton I , that the state has discriminated against property poor towns by requiring all towns to fund education primarily with local property taxes.[45] Rather, they are claiming that *72 the state is discriminating against schools with high numbers of poor and needy students by failing to ensure that such schools have funding that is substantially equal to the funding provided to other schools.[46] Thus, **727 to make a prima facie case under article first, §§ 1 and 20, the plaintiffs must show that disparities in educational funding between towns with large numbers of poor and needy students and schools with small numbers of such students are more than de minimis. Contrary to the plaintiffs' contention, this claim is not supported by the evidence showing that the ratio between the highest spending town and the lowest spending town is 2.30 and that the ratio of educational spending in the ninety-fifth percentile town ranked by "equalized net grand list per capita" to the educational spending in the fifth percentile town was 2.12 because the plaintiffs have not established that these particular school districts reasonably may be treated as proxies **728 for the school districts with the least and the most numbers of poor and needy students.[47] *73 The only evidence that the plaintiffs have cited that does shed light on the question of whether there are more than de minimis disparities in funding between schools serving large numbers of poor and needy students and other schools tends to undermine their claim. For example, they have cited undisputed evidence that shows that, in 2013, of the towns having student enrollments greater than 1000,[48] total education spending per pupil in the wealthiest decile as measured by "equalized net grand list per capita" was, on average, $15,713.61, compared to an average of $13,416.29 in the poorest decile.[49] This spending ratio is 1.17, a figure that is significantly lower than any of the figures that the court in Horton II cited as prima facie evidence of more than de minimis disparities. Other undisputed evidence shows that, in the same year, the state provided funding of nearly $9500 per student to schools in the poorest **729 decile of school districts with at least 1000 students, compared to less than $1200 per pupil in the wealthiest decile, a ratio of approximately eight to one.[50] As the trial court observed, it is difficult to see how this evidence supports the plaintiffs' claim that the state is discriminating against its poorest and neediest students.
We conclude, however, that we need not determine whether the plaintiffs have established a prima facie showing of more *74 than de minimis disparities because, even if they have, we conclude that the defendants have satisfied the second and third parts of Horton II , requiring them to prove that disparities in education spending are justified by a legitimate state policy and are not so great as to be unconstitutional. See Horton II , supra, 195 Conn. at 38, 486 A.2d 1099. With respect to the second part, the legitimate state policies that this court approved in Horton II were that the state's funding program "would provide sufficient overall expenditures for public **730 school education ... and a proper balance between state and local contributions thereto." Id., at 39-40, 486 A.2d 1099. This court expressly recognized that there is "a salutary role for [preserving] local choice by guaranteeing minimum funds without imposing a ceiling on what a town might elect to spend for public education." Id., at 40, 486 A.2d 1099. We have concluded in the present case that the trial court properly found that the state is providing a minimally adequate educational opportunity in all school districts according to the Campaign I criteria. Thus, the state is providing "sufficient overall expenditures for public education ...." Id., at 39, 486 A.2d 1099. In addition, the trial court found that the state is contributing significantly more funds to the neediest school districts than to the least needy, a finding that is also supported by the evidence. Under these circumstances, we do not believe that the fact that the wealthier school districts spend more per pupil on education than the poorer school districts by supplementing educational funds provided by the state with funds derived from local property taxes renders the funding scheme unconstitutional. Indeed, the court in Horton II found that the policy in favor of preserving "local choice" justified far greater disparities in per student spending than the disparity in per student spending that has been established in the present case between the towns in the wealthiest decile and those in the poorest decile. Id., at 40, 486 A.2d 1099.
The plaintiffs contend, however, that this court rejected the maintenance of local control of schools as a legitimate public policy that would justify disparities in education spending in Horton I , supra, 172 Conn. at 638, 649, 376 A.2d 359, when this court recounted with approval the trial court's finding that, "although local control of public schools is a legitimate state objective, since local control of education need not be diminished if the ability of towns to finance education is equalized, the local control objective is not a rational basis for retention of **731 the present financing system ...." In Horton II , however, we clarified this statement when we held that, if the state provides significant equalizing funds to poorer towns, the state need not place limits on what wealthier towns may spend on education, thereby retaining room for local control. See Horton II , supra, 195 Conn. at 40, 486 A.2d 1099. We express no opinion on whether allowing wealthier towns to supplement education spending through local property taxes is the best education policy. We do conclude, however, that such a policy is not unconstitutional.
Under the third part of Horton II , the state must prove that the effect of the state's education funding system is "to narrow significantly disparities in the ability of local communities to finance local education and to increase significantly the state's share of overall educational costs for public schools." (Footnote omitted.) Id., at 40, 376 A.2d 359. Again, this part is satisfied by the trial court's finding that the state's education spending is "tilt[ed]" strongly in favor of needier school districts, a finding that was supported by the undisputed evidence showing that, in 2013, there was a strong inverse correlation between *75 the wealth of a school district and the amount of state aid that it received. Although neither the plaintiffs nor the defendants have directed us to any evidence that is probative on the issue of whether the state's share of overall education funding has increased significantly from some benchmark date, the trial court expressly found that "the state has not violated the constitution by devoting an overall inadequate level of resources to the schools," and the plaintiffs have not directly challenged that finding on appeal. Rather, they have relied on disparities in educational funding.
Although the plaintiffs have convincingly demonstrated that in this state there is a gap in educational achievement between the poorest and neediest students and their more fortunate peers, disparities in educational **732 achievement, standing alone, do not constitute proof that our state constitution's equal protection provisions have been violated. The plaintiffs have not shown that this gap is the result of the state's unlawful discrimination against poor and needy students in its provision of educational resources as opposed to the complex web of disadvantaging societal conditions over which the schools have no control. Indeed, the trial court found that the state is providing significantly more educational resources to schools with large numbers of poor and needy students than to other schools. We conclude, therefore, that the plaintiffs have failed to establish that the defendants have violated article eighth, § 1, and article first, §§ 1 and 20, by failing to provide a minimally adequate and substantially equal educational opportunity to all students in this state.
The judgment is reversed with respect to the trial court's determination that the defendants are violating article eighth, § 1, of the Connecticut constitution and the case is remanded to that court with direction to render judgment for the defendants on that claim; the judgment is affirmed with respect to the trial court's determination that the defendants are providing a substantially equal educational opportunity under article first, §§ 1 and 20, of the Connecticut constitution.
In this opinion EVELEIGH, VERTEFEUILLE and ALVORD, Js., concurred.
PALMER, J., with whom ROBINSON and SHELDON, Js., Concurring and Dissenting.
"[A] sound education is the 'very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed **733 in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.' Brown v. Board of Education , [347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ]. 'The American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance.... We have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government ... and as the primary vehicle for transmitting the values on which our society rests.... [E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our [n]ation when select groups are denied the means to absorb the values *76 and skills [on] which our social order rests.' " Sheff v. O'Neill , 238 Conn. 1, 43-44, 678 A.2d 1267 (1996). That is what this case is about.
I
A
Before I explain the nature of my disagreements with the majority, I begin by noting the substantial overlap between my views and those of the majority. As an initial matter, I agree, for the reasons articulated in the majority opinion, that both the individual plaintiffs[1] and the named plaintiff, the Connecticut Coalition for Justice in Education Funding, Inc., have standing to pursue the present action. I also agree with the majority's analysis of the equal protection issue and with its conclusion that the trial court correctly determined that there was no equal protection violation.
**734 Turning to the principal substantive question-whether the state has satisfied its obligation to provide underprivileged children with minimally adequate educational opportunities as required by article eighth, § 1, of the Connecticut constitution-I agree with the majority's threshold determination that my articulation of the Campaign I[2] test in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , 295 Conn. 240, 342, 990 A.2d 206 (2010) (Palmer, J. , concurring in the judgment), represents the controlling legal standard. Furthermore, I largely agree with the way in which the majority characterizes my position in Rell , both in terms of how I articulated the Campaign I test and the extent to which my views differed from those of the plurality. First, the majority properly recognizes that whether the state has satisfied its obligation to afford minimally adequate educational opportunities may be evaluated on a district-by-district basis, and even at the level of individual schools;[3] the question is not merely whether Connecticut residents, in the aggregate, receive adequate schooling.[4] See, e.g., footnote 15 of the majority opinion.
Second, I agree with the majority that, when we consider whether the various Campaign I factors have been satisfied, we do not do so in a vacuum, divorced from the goals and purposes of a minimally adequate education. Instead, the state's compliance with its constitutional mandates must be evaluated in light of **735 whether the specific educational facilities, instrumentalities, curricula, and personnel; see part I B of this opinion; that the state provides are rationally calculated to allow a student who takes advantage of them to become a functional member of society. As the majority explains, "[i]t is implicit in the Campaign I criteria ... that the educational opportunities offered by the state must be sufficient to enable a student who takes advantage of them to attain a level of knowledge of reading, writing, mathematics, science, and social studies that will enable the student to perform *77 the basic functions of an employable adult in our society, such as reading newspapers, tax forms and other basic texts, writing a basic letter, preparing a household budget, buying groceries, operating cars and household appliances, serving on a jury and voting." Footnote 25 of the majority opinion.
Third, the majority properly emphasizes that judicial review of the state's education policies and spending priorities under article eighth, § 1, should be highly deferential, as such considerations are quintessentially legislative in nature. As I explained in Rell , "the plaintiffs will not be able to prevail on their claims unless they are able to establish that what the state has done to discharge its obligations under article eighth, § 1, is so lacking as to be unreasonable by any fair or objective standard." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 321, 990 A.2d 206 (Palmer, J. , concurring in the judgment); see id., at 343, 990 A.2d 206 (Palmer, J. , concurring in the judgment) (plaintiffs must demonstrate that education "reasonably cannot be considered sufficient by any fair measure"); see also id., at 335-43, 990 A.2d 206 (Palmer, J. , concurring in the judgment) (explaining reasons why "[s]pecial deference" to legislature is warranted in matters of educational policy and funding).
Fourth, the majority recognizes that the scope of my disagreement with the plurality in Rell was quite **736 narrow. See footnote 46 of the majority opinion. My primary concern in Rell was that certain language in the plurality opinion could be construed to mean that article eighth, § 1, requires that the state guarantee that each student will receive a minimally adequate education.[5] I concluded, by contrast, that the state constitution only guarantees each student the opportunity to obtain such an education. As the majority puts it, "the state's offerings [must be] sufficient to enable a student who takes advantage of them to become a functional member of society." Text accompanying footnote 25 of the majority opinion. Requiring that each student actually be adequately educated would place an unreasonable burden on the state, insofar as schools "cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder[s] the academic achievement of those students." (Internal quotation marks omitted.) Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 345, 990 A.2d 206 (Palmer, J. , concurring in the judgment); see also id. (because students' failure to achieve goals of constitutionally mandated education may be caused by factors not capable of remediation by state action, article eighth, § 1, "is not a panacea for all of the social ills" that contribute to achievement deficiencies of **737 underprivileged students [internal quotation *78 marks omitted] ). Beyond that, however, my understanding of the Campaign I test was not-and is not-substantively different from the standard that the plurality articulated in Rell.[6]
Finally, as I discuss more fully in part II B of this opinion, I agree with the majority that the trial court exceeded its mandate and failed to apply the proper standard of review in the second half (parts 5 through 8) of its memorandum of decision, in which it scrutinized the rationality of the state's various educational policies, procedures, and spending priorities. In the remainder of this opinion, I explain in what respects I do not agree with the majority opinion.
B
Before I explain in what respects I think that both the trial court and the majority have gone astray, it will be helpful briefly to review the Campaign I test and to set forth with greater precision certain aspects of that test that could perhaps have been stated more directly in my concurrence in Rell. At the most basic level, Campaign I stands for the proposition that, to afford students the opportunity to obtain a minimally adequate education, the state must ensure the presence of certain core or essential components: "Children are entitled to minimally adequate physical facilities and **738 classrooms which provide enough light, space, heat, and air to permit children to learn. [Facilities]. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. [Instrumentalities]. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies [curricula], by sufficient personnel adequately trained to teach those subject areas. [Personnel]." Campaign for Fiscal Equity, Inc. v. State , 86 N.Y.2d 307, 317, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995). These core components-educational facilities, instrumentalities, curricula, and personnel-constitute the sine qua non of any educational system.
1
Although these four components are individually necessary to the provision of a minimally adequate education, neither my concurrence in Rell nor Campaign I itself suggested that they are jointly sufficient. As I observed in Rell , for example, "[i]t goes without saying that a safe and secure environment also is an essential element of a constitutionally adequate education." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 342 n.15, 990 A.2d 206 (Palmer, J. , concurring in the judgment). By the same token, in Campaign I , the New York Court of Appeals suggested that school transportation is necessary to ensure that students attend school a minimum number of days and thus receive a sound education. See *79 Campaign for Fiscal Equity, Inc. v. State , supra, 86 N.Y.2d at 316, 631 N.Y.S.2d 565, 655 N.E.2d 661. Ensuring that students have access to sustenance of some sort during the school day is almost certainly of the same ilk. The point, which I think is beyond cavil, is that it is not enough to satisfy constitutional requirements for the state simply to set up and equip school buildings and then hire teachers to teach therein. Reasonable **739 efforts must be made to ensure that those students who would avail themselves of the educational opportunity have a means of getting themselves to school and, once there, are not so preoccupied by hunger, fear for their personal safety, or other serious distractions as to render learning effectively impossible. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 315, 990 A.2d 206 (plurality opinion) ("[t]o satisfy this standard, the state, through the local school districts, must provide students with an objectively meaningful opportunity to receive the benefits of this constitutional right" [internal quotation marks omitted] ).
2
It also bears emphasizing that the provision of books, teachers, buildings, and the like is not an end in itself, but all to the purpose of giving students the opportunity to obtain a minimally adequate modern education. What constitutes a minimally adequate education is, within reasonable limits, to be left to the discretion of the legislature. See, e.g., id., at 332, 990 A.2d 206 (Palmer, J. , concurring in the judgment). Viewed in the broadest terms, such an education is one "suitable to give [its students] the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting, and to prepare them to progress to institutions of higher education, or to attain productive employment and otherwise to contribute to the state's economy." Id., at 270, 990 A.2d 206 (plurality opinion). On a more practical level, the state has established various benchmarks, including standardized test scores, that, when taken together, help to inform our understanding of what a student who has received a minimally adequate education can be expected to know. What article eighth, § 1, requires, then, is that the state establish and maintain free public schools the core elements of which are reasonably calculated to deliver a minimally adequate **740 education, as so defined, to all those students who would take advantage of the opportunity.
3
It follows from these principles that the state, in designing an educational system and delivering educational services, must make at least some reasonable effort to account for the distinct learning challenges that confront many of our state's least fortunate children. Although it may be assumed that many if not most of the students in Connecticut's more affluent towns have had their basic needs satisfied and arrive at school ready to learn, the same cannot be said for children who have spent their entire lives in poverty. Residents of our poorest communities, even those hungry to learn, may have to overcome a host of obstacles before they are able to attend to fractions and Fitzgerald. These run the gamut from homelessness, malnutrition, and illness, to violence in the home and in the community, to the pervasive and pernicious effects of racism. Some students struggle to learn in a non-native tongue; others wrestle with undiagnosed disabilities, whether physical, academic, or emotional/psychological.
As I acknowledged in Rell , article eighth, § 1, is not a panacea for all of society's ills, and the state cannot be expected *80 to "overcome every serious social and personal disadvantage that students bring with them to school ...." (Internal quotation marks omitted.) Id., at 345, 990 A.2d 206 (Palmer, J. , concurring in the judgment). As I also made clear in that decision, however, as part of its reasonable efforts to afford each child the opportunity to obtain a minimally adequate education, the state must "tak[e] into account any special needs of a particular local school system." (Internal quotation marks omitted.) Id., at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment). The quoted language is drawn from Justice Borden's dissent in **741 Sheff v. O'Neill , supra, 238 Conn. at 143, 678 A.2d 1267, an opinion in which I joined. That part of Justice Borden's opinion makes clear that the symptoms of poverty that I have described are precisely the types of "special needs of a particular local school system"; id. (Borden , J. , dissenting); that the state must take into consideration: "[T]est scores do not take into account important variables that erect difficult barriers to achievement, such as socioeconomic status, early environmental deprivations, low birth weight, mothers on drugs [when their children are born], diminished motivation to succeed academically, extraordinary mobility, limited English proficiency, and all of the other dismal factors associated with the concentration of poverty in the Hartford school district." Id., at 144, 678 A.2d 1267 (Borden, J. , dissenting). "This is not to say that, as part of its ... constitutional obligation to provide a minimally adequate education, the state has no obligation to attempt, by reasonable means, to ameliorate these problems." Id. Consistent with Justice Borden's opinion, I concluded in Rell that the plaintiffs had stated a legally cognizable cause of action when they alleged, among other things, that "significant disparities in [education] input statistics [exist] between the plaintiffs' schools and the state school average .... [M]any [students] attend schools that do not have the resources necessary to educate their high concentration of poorly performing students ... [and] the state has failed to provide the resources necessary to intervene effectively on behalf of [at risk] students, that is, students who, because of [a] wide range of financial, familial, and social circumstances, [are] at greater risk of failing or experiencing other unwanted outcomes unless intervention occurs .... As a consequence ... Connecticut has an educational underclass that is being educated in a system [that] sets them up for economic, social, and intellectual failure." (Internal quotation marks omitted.) **742 Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 346 n.20, 990 A.2d 206 (Palmer, J. , concurring in the judgment). There should be no doubt, then, that the Campaign I test, as articulated and applied in my concurrence in Rell , requires not only that the state provide the essential components of a minimally adequate education, including facilities, instrumentalities, curricula, and personnel, but also that some reasonable effort be made to ensure that those modalities are designed to address the basic educational needs of at risk learners in underprivileged communities.
The majority correctly notes that elementary and secondary schools are not the only source of support services, and that the state may choose to address the social, economic, and mental and physical health needs of underprivileged students through other state agencies, preschools, and other programs. See footnote 41 of the majority opinion. It is important to bear in mind, however, that article eighth, § 1, requires that the state , not the schools, provide students with the opportunity to obtain a minimally adequate education. If the plaintiffs *81 were able to establish that (1) such needs can be met through reasonable interventions, (2) the schools are not meeting such needs, and (3) the failure to meet such needs is denying high needs children the opportunity to receive a minimally adequate education, then the state must prove that it is addressing such needs outside of the school environment. In other words, the fact that the state has the discretion to address educational impediments through nonschool agencies does not relieve the state of its ultimate constitutional responsibility to ensure adequate educational opportunities.[7] **743 II
In order to understand how this constitutional standard applies in practice, it will be helpful to briefly review where and how the trial court went astray. Although it is not entirely clear, I understand the trial court to have taken the following path.[8]
A
The court appears to have concluded that the Campaign I test that this court articulated in Rell involves two components, each of which is subject to a different standard of review. The first component is adequate funding. In the first half (parts 3 and 4) of its memorandum of decision, the trial court evaluated aggregate state funding of facilities, equipment, teachers, and curricula, and assessed whether those expenditures were constitutionally sufficient. The trial court reviewed the state's educational expenditures according to a highly deferential standard, as prescribed in my concurrence in Rell , proceeding according to the principle that "any constitutional standard the courts set for overall spending levels must be modest." The court evaluated whether overall state educational spending levels exceed the bare constitutional minimum, bearing in mind that, to find a violation, it had to conclude beyond a reasonable doubt that the resources that the state dedicates to education are "unreasonable by any fair or objective standard ...." (Internal quotation marks omitted.) Assessing the trial evidence according to this standard, the court concluded that the plaintiffs had failed to demonstrate that the state's aggregate educational expenditures are constitutionally insufficient.
**744 In this first portion of its analysis, the trial court also specifically concluded that the state has spent more than the constitutional minimum-whatever that sum might be-on new school building projects. It noted that the state (1) allocated $1 billion per year to spending on school buildings, (2) increased such spending over the course of the prior decade, and (3) approved and helped to fund more or less every new building project proposed by poor school districts such as those in the cities of Bridgeport and Hartford. The court further concluded that, when judged by a "minimal standard," there was no evidence that there was a "statewide failure"
*82 to provide schools with adequate resources to train their teachers, to acquire reasonably current books and other suitable equipment and facilities, or to deploy interventionists, teacher coaches, and technical support staff. In addition, the court discussed the various financial resources that are available to help the lowest performing districts invest in areas such as school improvements, student meals, after-school programs, and services for homeless and pregnant students, young parents, and individuals with mental health needs. Although the court's primary focus in this section of its decision was on financial resources, the court did also briefly observe that Connecticut's children are taught by minimally adequate teachers and provided with reasonably up-to-date basic curricula, and also that there was no evidence that the state's schools, when considered in the aggregate, lack enough light, space, heat, air, desks, chairs, pencils, or textbooks to permit children to learn. On the basis of these findings and conclusions, the court ultimately concluded that the Campaign I test that this court adopted in Rell had been satisfied and that the plaintiffs had failed to establish a constitutional violation in that respect.
The second portion of the trial court's analysis involved a more wide ranging review of the state's specific **745 educational policies, procedures, and priorities. In parts 5 through 8 of its decision, the trial court scrutinized everything from the amount of money spent on educating severely disabled students to the formula for teacher compensation set forth in individual school districts' collective bargaining agreements; from social promotion policies to the role that pork-barrel politics play in deciding which school construction projects will be authorized. The court appears to have concluded that its assessment of the rationality of these various policies and priorities was subject to a heightened standard of review rather than the highly deferential standard that I articulated in my concurrence in Rell and that the trial court itself applied in parts 3 and 4 of its decision when it assessed the state's aggregate spending in accordance with the four Campaign I factors. Specifically, the court proceeded on the assumption that not only specific educational policies and priorities but also the "first principles" that underlie them must be "rationally, substantially, and verifiably" related to teaching.
B
In analyzing the plaintiffs' claims under article eighth, § 1, in this manner, the trial court failed to properly apply the Campaign I test in several respects. First, and most fundamentally, the court should not have treated educational funding and educational policy as distinct legal issues, subject to different legal standards. Rather, the proper approach was to evaluate whether the state's comprehensive system for delivering educational services-including financial and other resources, policies, and procedures-is rationally designed to ensure that each student will have the opportunity to obtain a minimally adequate education.
In this respect, I agree with the majority insofar as it holds that the trial court, having once concluded that the Campaign I test was satisfied, should not have **746 proceeded to assess the rationality of the state's various education policies. There is no rationality test above and beyond the Campaign I standards. Rather, the rationality test is part and parcel of Campaign I.
What the majority fails to recognize, however, is that the trial court improperly stripped out this rationality review from its Campaign I analysis and thus fundamentally *83 misapplied that test. As I set forth in greater detail in part III of this opinion, it is clear that the trial court ultimately concluded that schools in many of our state's less affluent cities and towns are "utterly failing ...." The court found that underprivileged students attend schools staffed by inexperienced and unqualified teachers. It determined that some cities and towns routinely ignore or under identify students with learning disabilities, and that guidance, counseling, and early intervention resources are woefully inadequate. It observed how the elimination of school bus services in Bridgeport requires some high school students to switch multiple transit buses just to make it to school in the morning. It concluded that many impoverished students, and many racial minorities, reach adulthood without having achieved even basic literacy and numeracy skills, and suggested that dedicating additional resources to programs such as high quality preschool could improve high school success rates. Many of these findings would, presumably, be highly relevant to the question of whether the state is affording minimally adequate educational opportunities to all of its students.
And yet there is no indication that the court considered any of these findings in parts 3 and 4 of its decision before it concluded that the plaintiffs had failed to demonstrate that the state does not provide minimally adequate facilities, instrumentalities, curricula, and personnel.
**747 [9] Although the court made a few references to "anecdotal evidence" of physical deficiencies in some schools and of teachers having to purchase their own supplies, it appears to have proceeded on the assumption that the Campaign I test is concerned largely, if not exclusively, with financial matters-whether the state is spending large sums on education, in the aggregate, and is helping cities and towns to build new schools and to pay for support services.[10] In other words, the court appears to have believed that it was not free to consider most of the potentially relevant evidence before it when it was conducting its constitutional analysis.[11] I fail to understand *84 how that could not constitute reversible error. See part III of this opinion. **748 A second problem with the trial court's Campaign I analysis is that the court appears to have been operating under the mistaken belief that the four Campaign I factors are to be assessed solely at the statewide level, rather than with regard to specific districts and schools. In the course of its analysis, the court made numerous statements suggesting that it felt constrained to evaluate the state's educational spending, and compliance with the Campaign I requirements more generally, solely in the aggregate. The court began by noting, in the context of discussing its standard of review, that "the judiciary is constitutionally unfit to set the total amount of money the state has to spend on schools." (Emphasis added.) "Thus, if the court weren't limited by the minimal elements listed in [ Campaign I ], it would still reject an expansive view of its power to set overall state educational spending levels." (Emphasis added.) Turning to the first Campaign I factor, namely, facilities, the court began and more or less ended its analysis with the observation that the state spends $1 billion per year on school buildings. The court proceeded to emphasize that the state has committed $378 million for new projects in Bridgeport alone and briefly alluded to "anecdotal evidence of physical deficiencies in some schools ...." Nonetheless, it dismissed such concerns not by concluding that each such deficiency failed to reach the level of a constitutional violation but, instead, by explaining that the record contained **749 "nothing to suggest a statewide failure to provide adequate facilities ...."[12] (Emphasis added.)
The court's analysis of the other Campaign I factors likewise suggests that the court was concerned only with whether the plaintiffs could establish systemic, statewide failures to provide minimally adequate educational opportunities. With regard to instrumentalities, the court reasoned: "[T]here is no proof of a statewide problem caused by the state sending school districts too little money.... There are certainly some hardships with computers and significant disparities in computer access, but against a minimal standard the plaintiffs have not proved ... that there is a systemic problem that should spark a constitutional crisis and an order to spend more on school supplies." (Emphasis added.) The court's analysis of the state's educational personnel was in the same vein: "No one suggests that teaching in Connecticut is broadly incompetent. The claim is that opportunities for good teaching are not being rationally marshaled in favor of needy kids. Judged against a low minimum and judged as a system , the plaintiffs have plainly not met their burden ...." (Emphasis added.) True, the court proceeded to consider whether the state dedicates enough resources to "needy schools," concluding that it does. Even *85 there, however, the court considered such spending only in the aggregate. The theory seemed to be that, if the state budget contains a sizable line item for needy school support, then the constitutional requirement is necessarily satisfied. No consideration was given to whether there are particular schools in which spending on particular academic programs or needs is insufficient to **750 provide the students who attend those schools with minimally adequate educational opportunities.[13]
The trial court made other, different missteps in the second half of its decision. In that section of the analysis, the court properly considered the specific quality of education afforded to students in individual school districts such as Bridgeport, specifically, whether schools receive adequate financial support to hire and retain essential support staff, whether students are provided with adequate transportation, whether they are able to master basic literacy skills, and how they perform on standardized assessment tests and based on other measures of high school achievement.
But, here, the court applied a standard of review-requiring that the state's educational policies and priorities be reasonably, substantially, and verifiably related to teaching-that finds no support in Rell and that had the practical effect of shifting to the state the burden of proving that every aspect of its educational system complies with article eighth, § 1, by requiring that all of the state's "efforts" be "verifiable enough to be measured ...." Having adopted this novel standard of review, the trial court proceeded to identify various, purported irrationalities in the system that required the court to choose sides on philosophical questions that are hotly contested by educators and academics, some **751 of which the plaintiffs had not even challenged.[14] All of this ran afoul of my warning in Rell that "[t]he very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that, within the limits of rationality, the legislature's efforts to tackle the problems should be entitled to respect.... In such circumstances, the judiciary is well advised to refrain from imposing on the [state] inflexible constitutional restraints ...." (Internal quotation marks omitted.) Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 336, 990 A.2d 206 (Palmer, J. , concurring in the *86 judgment); see also id., at 344 n.18, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("[I]t is one thing for a court to determine whether the legislature has acted rationally in fulfilling its obligation under article eighth, § 1, and something entirely different for a court to decide which of two positions concerning the specific parameters of a minimally adequate education in practice ... is the better position.... [T]he latter methodology unduly involves the judiciary in matters of educational policy that are primarily reserved to the political branches, and for which the judiciary is both ill suited and ill equipped.").
So what should the trial court have done? It should have performed a single legal analysis, applying the Campaign I test, as articulated in my concurrence in Rell , to the specific educational failings that the plaintiffs allege exist in specific schools and school districts. It should have determined whether, in light of its factual **752 findings regarding both financial and nonfinancial considerations, the state's educational programs are reasonably calculated to satisfy each of the Campaign I criteria so as to ensure that students in those districts have the opportunity to secure the fruits of a minimally adequate education. And it should have made these determinations in light of the "special needs of ... particular local school system[s]," as defined in Justice Borden's dissent in Sheff v. O'Neill , supra, 238 Conn. at 143, 678 A.2d 1267.
III
My disagreement with the majority over the controlling legal standard compels me to part ways with respect to the appropriate resolution of this appeal. The majority concludes that the trial court (1) applied the correct legal standard in parts 3 and 4 of its decision, and (2) properly determined that the plaintiffs had failed to establish that Connecticut's schools have delivered less than a minimally adequate education. For this reason, the majority would simply reverse the judgment of the trial court-because it exceeded its mandate in parts 5 through 8 of its decision-with direction to render judgment for the defendants.
The plaintiffs argue that they are entitled to an opportunity to prevail at a new trial under the Campaign I standard, as properly applied. They emphasize, and the majority acknowledges, that the trial court found, among other things, that (1) the Bridgeport public schools have been forced to cut key support personnel and even school bus service at the same time as some wealthier districts have received an influx of new state funds; see footnote 1 of the majority opinion; (2) other high needs schools have inadequate classroom facilities and shortages of experienced teachers, specialists, interventionists, and counselors, (3) large numbers of high needs students are not even approaching appropriate **753 educational outcomes, (4) preschool opportunities are unavailable for large numbers of low income students, despite their proven link to improved educational outcomes, and (5) the state has provided inadequate socioemotional and related support services for high needs students. Indeed, the majority readily acknowledges that "the plaintiffs have convincingly demonstrated that in this state there is a gap in educational achievement between the poorest and neediest students and their more fortunate peers ...." Nevertheless, it is the view of the majority that such findings are simply irrelevant under the "narrow Campaign I criteria."[15] Text accompanying *87 footnote 41 of the majority opinion.
I disagree. As I explained in part II B of this opinion, I believe that the trial court misapplied Campaign I in several respects. "We have often stated that a party is generally entitled to a new trial when, on appeal, a different legal standard is determined to be required, unless we conclude that, based on the evidence, a new trial would be pointless." McDermott v. State , 316 Conn. 601, 611, 113 A.3d 419 (2015) ; see, e.g., id., at 12, 113 A.3d 419 (holding that Appellate Court, having concluded that trial court applied wrong legal standard, should have remanded case for new trial rather than directing judgment); see also In re Joseph W. , 305 Conn. 633, 648, 46 A.3d 59 (2012) (citing cases). Having reviewed the trial record in the present case, I cannot conclude that a new trial under the correct legal standard would be pointless. Rather, the trial court's factual findings indicate that **754 some of our state's most disadvantaged students may not be receiving a minimally adequate education, which is their constitutional right. The evidence that, according to the plaintiffs, warrants a new trial falls into three broad categories: (1) academic outcomes; (2) educational inputs; and (3) educational policies. I briefly consider each in turn.[16]
A
I agree with the majority that the trial court's primary focus in evaluating whether the state has complied with its constitutional obligations should be on the adequacy of educational inputs, rather than on students' level of academic achievement. As I explained in Rell , "student achievement may be affected by [too] many factors outside the state's control" for the state to be able to guarantee academic outcomes. Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment).
I have never suggested, however, that educational outcomes are uninformative or irrelevant to the constitutional analysis. See id. ("I do not suggest that educational 'outputs' are never relevant to the determination of whether the state has complied with the requirements of article eighth, § 1"). I agree with the majority, for example, that the fact that high needs students in one school or district have experienced some measure of academic success while students with a similar demographic profile in another school or district have failed, in the aggregate, to demonstrate even minimal progress may indicate that the latter have not been afforded **755 minimally adequate educational opportunities. See footnote 32 of the majority opinion. At the very least, it suggests that closer scrutiny is warranted.
More fundamentally, evaluation of educational outputs will, in many instances, be a fundamental and necessary starting point in evaluating claims brought under article eighth, § 1. This is because outcomes provide the clearest evidence of *88 whether Connecticut's students are in fact receiving a minimally adequate education. Although one can imagine extreme cases in which the failure to achieve educational objectives may be presumed,[17] challenges such as those brought by the plaintiffs in the present case are most reasonably resolved by first determining whether students have in fact been unable to obtain a minimally adequate education, as defined by the state. If the plaintiffs can establish such a deficiency, then the trial court must determine whether "the failure of students to achieve the goals of a constitutionally mandated education [are] the result of specific deficient educational inputs, or [have been] caused by factors not attributable to, or capable of remediation by, state action or omission ...." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 318, 990 A.2d 206 (plurality opinion).
In the present case, the trial court found that a number of the state's schools are "utterly failing" and that one third of high school students in poorer communities such as Bridgeport, Windham, and New Britain fail to reach even the most basic levels in math and reading. In the trial court's words, "[n]ot reaching the most basic level means they [do not] have even limited ability to read and respond to grade level material. There can be **756 no serious talk of these children having reached the goals set for them." The trial court made numerous specific findings regarding the failure of different underprivileged student populations to achieve minimal academic success according to various objective benchmarks established by the state.
With respect to economically disadvantaged students, the court found, among other things, that Connecticut's fourth and eighth grade students who qualify for free and reduced lunch services rank among the lowest in the nation on National Assessment of Educational Progress (NAEP) math assessments. Between 80 and 90 percent of the state's poor students failed to reach the minimum standards for high school reading as assessed by Smarter Balanced Assessment Consortium (SBAC) tests. More than 70 percent of the impoverished students entering the state's higher education system lack basic literacy and numeracy skills.
The court also found that success rates for economically disadvantaged students vary dramatically between school districts, which suggests that differing academic outcomes may arise from differing inputs and educational strategies rather than any intractable barriers to learning created by poverty. On the 2015 SBAC mathematics test, for example, only 9.1 percent of Bridgeport students and 11 percent of New Britain students who qualified for free or reduced lunch performed at level 3 or above, whereas over 40 percent of students who qualified for free and reduced lunch reached that level in towns such as Darien, Ridgefield, and Weston. At the other end of the spectrum, approximately two thirds of students eligible for free and reduced lunch in Bridgeport and New Britain performed only at level 1, more than twice the rate as in Darien.
More generally, the trial court's findings highlight the dramatic differences in educational outcomes between **757 the state's more affluent and less affluent communities. The court found that students in *89 struggling elementary schools in poor communities are not acquiring basic reading, writing, and math skills, and that virtually none of the students in many inner-city schools has the skills needed to progress beyond third grade. On the 2013 Connecticut Academic Performance Test (CAPT) mathematics assessment, over 38 percent of students in New Britain, over 41 percent of students in Bridgeport, and nearly one half of all Windham students scored in the "Below Basic" range. In more affluent towns such as Westport and Weston, by contrast, the number of students scoring in the "Below Basic" range was negligible. Similar disparities were observed on the CAPT reading and science assessments.
With respect to the secondary level, out of 1177 students attending Bridgeport's Bassick High School in 2013, only 6 percent even attempted to take an advanced placement (AP) exam, and, of those who did, only 3 students earned a qualifying score, which indicates an ability to complete college level work. By contrast, approximately one fourth of all students at Darien High School took AP exams and almost all earned qualifying scores. No more than 15 percent of high school graduates in Bridgeport, Hartford, New Haven, and Waterbury were deemed to be college and career ready. As judged by Preliminary Scholastic Aptitude Test (PSAT) scores, less than 2 percent of students in Bridgeport were on track to be college and career ready.
The court also made specific findings with respect to the academic success of students who are not native English speakers or are racial minorities. As of 2012-2013, for example, the school districts of Bridgeport, Danbury, East Hartford, Hartford, Meriden, New Britain, New Haven, New London, Norwalk, Norwich, Stamford and Waterbury all had failed to meet Annual Measurable Achievement Objectives (AMAO) performance **758 targets for English as a Second Language students for the previous ten years. This means that English language learning students do not have the language or vocabulary skills needed to pass a language proficiency test. On the 2013 CAPT mathematics assessment, nearly 50 percent of all African-American students scored in the "Below Proficient" range versus 10.6 percent of white students.[18] Ultimately, on the basis of such findings, the trial court concluded beyond a reasonable doubt that, "for thousands of Connecticut students there is no elementary education, and without an elementary education there is no secondary education." (Emphasis omitted.)
B
There is little dispute that educational inputs represent the most important consideration in assessing whether the state has satisfied its constitutional obligation to ensure that Connecticut residents have a reasonable opportunity to obtain a minimally adequate education. If students in each school have access to adequate facilities, equipment, teachers, and curricula, as well as other essentials such as transportation and security, then a presumption arises that they have been afforded this opportunity. By contrast, the failure to provide these basic essentials supports a conclusion that the state has failed to meet its obligations under article eighth, § 1.
In the present case, notwithstanding its conclusion that the four Campaign I factors have been satisfied and that the state *90 invests heavily in the lowest performing and highest needs schools, the trial court clearly was of the view that academic inputs in our state's most disadvantaged communities are not reasonably calibrated to achieve minimally adequate academic **759 outcomes. With respect to staffing levels, for example, the court emphasized that schools with higher percentages of low income and minority students are forced to hire inexperienced and unqualified teachers and administrators at higher rates, and that more than one half of the professional staff in such schools depart, on average, within five years. Moreover, although wage premiums are often required to attract teachers to high poverty and high minority school districts and thereby improve student achievement, state educational funds have flowed in the opposite direction. Although educator salaries in the state's poorest communities are significantly lower than the state average, wealthy school districts have been allowed "to raid money desperately needed by poor towns ...." For instance, the state recently cut educational aid to the poorest school districts by over $5.3 million, forcing districts such as Bridgeport to cut essential staff, including guidance counselors and special education paraprofessionals, while simultaneously increasing aid to many comparatively wealthy towns.
Schools in low income, high poverty districts already had significantly fewer counselors and academic support staff per student, despite demonstrably greater needs. Among the court's many specific findings in this regard: Bridgeport's Bassick High School has only 4 full-time guidance counselors for nearly 1200 students and New London has only 3 to serve over 900 students. Windham has only 4 full-time school psychologists serving a population of almost 3200 students; the student to psychologist ratio is far lower in more affluent towns such as Greenwich and Westport, even though those towns have a lower percentage of students with disabilities. Waltersville School in Bridgeport, which has a student population of approximately 600 ranging from prekindergarten to eighth grade, has only one literacy coach, one guidance counselor, and no social workers **760 available to meet the socioemotional needs of students who do not have individual education plans. Roosevelt School and Bryant Elementary School in Bridgeport suffer from similar staffing shortages. Ultimately, the court found that inadequate staffing levels meant that schools in certain less affluent school districts were unable to satisfy their legal requirements to meet the needs of special education students.
Turning to East Hartford, the trial court found that economically disadvantaged school district has only one translator, who speaks Spanish, even though the district's students collectively speak 50 different languages; has 4 or 5 elementary schools that do not have a social worker; has only 1 social worker for 400 ninth grade students, which is insufficient to meet their varied socioemotional needs; has only 1 high school reading intervention teacher, which leaves many students who are far below grade level unable to access reading support services; and employs only 1 high school psychologist who, despite working 70 to 90 hours per week, is unable to meet the needs of the district's 1700 high school students.
Some of the court's findings in this respect were so dramatic that it is questionable whether the Campaign I factors are being satisfied even under the narrowest reading of that case. For example, there are no reading teachers or reading interventionists to provide necessary literacy interventions in Bridgeport's comprehensive high schools. During the 2015-2016 school year, New London High School *91 filled a Spanish language instruction position with a substitute teacher who could not even speak or read that language. New Britain has no significant programs for homeless students, despite having approximately 500 homeless students in the district.
The court also found that, while there is widespread agreement that high quality preschool is perhaps the **761 single most effective tool for narrowing achievement gaps and preparing underprivileged students for success at the primary and secondary levels, a great number of children in Connecticut do not participate in preschool programs, and not all children who live in poverty have access to affordable programs. The court also found that insufficient funding was a significant impediment to broader access. Although there is no express constitutional requirement that the state provide free preschool programs, the state is required to take reasonable steps to ensure that students are able to learn, with an eye toward all of the available tools and their proven effectiveness. See part I B 3 of this opinion.
Finally, with respect to transportation and facilities, the trial court found that Bridgeport no longer provides school bus service to the comprehensive high schools, forcing students to transfer between multiple public transit buses to get to school in the morning. Some Bridgeport schools also have unreliable boilers, and ceilings fell in one building. In light of these findings, the trial court's ultimate conclusion appears to be that our "constitution's promise of a free elementary school education" could be realized if additional resources were marshaled in support of "drastic interventions" for the most troubled school districts.
C
Finally, the trial court identified various policies and procedures that, in its view, the state could modify in order to improve educational outcomes for underprivileged students. Indeed, the court went so far as to conclude that "many of our most important [educational] policies are so befuddled or misdirected as to be irrational."
As I explained in part II B of this opinion, I agree with the majority that the trial court generally overstepped its authority in parts 5 through 8 of its decision.
**762 Some of its policy prescriptions and related findings fail to afford sufficient deference to the political branches and to school administrators, taking sides in ongoing debates among educational experts or requiring that the state adopt or reject one among many facially reasonable approaches. In other instances, the court invalidates certain educational policies without making the necessary predicate finding that those policies have resulted in the state's failure to afford minimally adequate educational opportunities.
That is not to say, however, that policy questions fall completely beyond the legitimate ambit of the court's authority to review alleged violations of article eighth, § 1, or that a violation of that provision might not result from policy choices rather than from inadequate resourcing. This idea is implicit in Campaign I , which requires that schools adopt modern, age appropriate educational curricula. The majority concedes as much when it recognizes that "if the plaintiffs had shown that the state was providing elementary school students with books and curricula only intended for advanced college students, a court could conclude that the state was not reasonably meeting the minimal educational needs of these students ...."
The majority fails, however, to follow this hypothetical to its logical conclusion. If the constitution is violated when schools do not provide students with *92 learning materials reasonably suited to their level of cognitive development, why is it not also offended if, for example, a school fails to provide instruction or instructional materials that are comprehensible to a substantial subpopulation of students whose primary language is not English? At a minimum, it would seem that public schools must supply adequate professional staff to screen for and identify students who have serious impediments to learning and to refer them for appropriate services. In the present case, the trial court **763 found, among other things, that some poor school districts consistently ignore or under identify students with special educational needs and, therefore, fail to provide them with appropriate support services. In the face of such findings, I am unable to conclude that, if the plaintiffs were afforded the opportunity to prove their allegations under the correct legal standard, it is impossible that they could demonstrate that their right to a minimally adequate education has been violated.
IV
The state's duty to act rationally in developing and implementing a system for affording all students the opportunity to receive a minimally adequate education is not a duty disconnected from reality but a duty that must be exercised with a clear-eyed view of its essential purpose and a commitment to dealing with those circumstances of modern life that tend to frustrate that purpose. It is not enough to seek success in some places, for some children. Our schools must carry on in the faith that all students can learn, and our state must aspire to no less. Although the ultimate measure of an adequate educational opportunity for purposes of article eighth, § 1, cannot be educational outputs, the educational system must be reasonably designed to achieve results in every district and neighborhood. Our state constitution simply will not allow us to leave our neediest children behind.
Because the plaintiffs were not afforded the opportunity to prove their case according to the correct legal standard, and because there is reason to believe that the trial court may have found one or more violations of Campaign I if that test had been applied properly, I dissent from that portion of the majority opinion that directs judgment for the defendants. Instead, I would remand the case for a new trial.

For example, the trial court found that, in Bridgeport, school "[a]dministrators, clerks, guidance counselors and technicians are being shed. Kindergarten and special education paraprofessionals are being let go. Some schools have no extras like music and athletics left to cut. The school year is to be shortened. Class sizes are increasing in many places to twenty-nine children per room-rooms where teachers might have a class with one third requiring special education, many of them speaking limited English, and almost all of them working considerably below grade level. Many of these children get their only meals at school. They don't have two parents at home. Sometimes, they have no homes at all. They bounce from place to place and from school to school as the system struggles to find some way to teach them.
"For almost all students, there will be no high school buses in Bridgeport. Children will get tokens for the public transit system and some youngsters will have to figure out how to switch multiple transit buses just to make it to school in the morning.... It's the same in other poor towns. Too little money is chasing too many needs."

Article eighth, § 1, of the constitution of Connecticut provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Hereinafter, we refer to this provision as article eighth, § 1.

The individual plaintiffs who are participating in this appeal are Sherry Major and her daughter Nichole Major, who reside in Willimantic, Brenda Miller-Black and her daughters, Alison Black and Carolyn Black, who reside in Norwich, Walter and Janet Rivera and their daughter, Melody Rivera, who reside in New Britain, Lisette Velasquez, her son Ashariel Velasquez and her daughter Lyonece Velasquez, who reside in New Britain, Mary Gallucci and her sons, Pascal Phillips-Gallucci and Ellis Phillips-Gallucci, who reside in Willimantic, and Andrew Sklover and his daughters, Ryan Sklover and Marley Sklover, who reside in Stamford.

The defendants, who were named in their official capacities, are Governor M. Jodi Rell or her successor; State Board of Education members Betty J. Sternberg, Allan B. Taylor, Beverly R. Bobroske, Donald J. Coolican, Lynne S. Farrell, Janet M. Finneran, Theresa Hopkins-Staten, Patricia B. Luke and Timothy J. McDonald, or their successors; State Treasurer Denise L. Nappier or her successor; and State Comptroller Nancy S. Wyman or her successor.

Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." Hereinafter, we refer to this provision as article first, § 1.
Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." Hereinafter, we refer to this provision as article first, § 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments, as article first, § 20, and to article first, §§ 1 and 20, collectively, as the equal protection provisions.

The defendants filed an application for certification to appeal to this court from the judgment of the trial court pursuant to General Statutes § 52-265a, which the Chief Justice granted. The Chief Justice also granted the plaintiffs' request under § 52-265a that this court review issues decided adversely to them.

The court in Campaign I indicated that, in New York, the state legislature "has made prescriptions ... with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and of certain nonteaching personnel, pupil transportation, and other matters. If what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied." (Internal quotation marks omitted.) Campaign I, supra, 86 N.Y.2d at 316, 631 N.Y.S.2d 565, 655 N.E.2d 661. The plaintiffs in the present case have not relied on any similar statutory prescriptions in Connecticut. We assume for purposes of this opinion, however, that evidence that the state is operating its schools for only a very few days per year or is failing to provide minimally adequate student transportation could be considered as part of the court's adequacy determination.

In this regard, it is important to distinguish educational outputs, i.e., the actual level of student achievement, from the qualitative component of article eighth, § 1, i.e., the level of achievement that a student may attain if the student takes advantage of the educational opportunity that the state is offering.

In his dissenting opinion, Justice Zarella, joined by Justice McLachlan, contended that the stricken claims presented a nonjusticiable political question, and, therefore, the court lacked subject matter jurisdiction. Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 399-400, 990 A.2d 206 (Zarella, J. , dissenting). In her dissenting opinion, Justice Vertefeuille concluded that the stricken claims were justiciable, but that the trial court properly struck the claims because article eighth, § 1, was "intended to ensure the perpetuation of Connecticut's statewide system of free public schools, and was not intended to guarantee a 'suitable' education as interpreted by the majority." Id., at 384, 990 A.2d 206 (Vertefeuille, J. , dissenting).

Hereinafter, we refer to the plaintiffs' third amended complaint as the complaint.

The trial court's memorandum of decision did not contain an express ruling on the fourth count of the complaint, and the plaintiffs are not pursuing any claims on appeal to this court pursuant to 42 U.S.C. § 1983 (2012), which pertains to the deprivation of federal constitutional rights under color of state law.

Hereinafter, all references to the trial court are to Judge Moukawsher, unless otherwise indicated.

The criteria articulated by the New York Court of Appeals in Campaign I, supra, 86 N.Y.2d at 317, 631 N.Y.S.2d 565, 655 N.E.2d 661, were that the state must provide (1) "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn," (2) "minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks," (3) "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies," and (4) "sufficient personnel adequately trained to teach those subject areas." See part II of this opinion. Hereinafter, we refer to these as the Campaign I criteria.

The trial court apparently merged the third and fourth Campaign I criteria. See footnote 13 of this opinion.

We recognize that, if the plaintiffs had established that a particular school district did not meet the Campaign I criteria, the trial court could have found a violation of article eighth, § 1, with respect to that school district, and the plaintiffs were not required to prove that the educational system, considered as a whole, was constitutionally inadequate in order to obtain relief. As we discuss more fully later in this opinion, however, the plaintiffs have pointed to no factual findings or evidence that, under the Campaign I criteria, would compel the conclusion that the state's educational offerings in any particular school district are not constitutionally adequate. See part III of this opinion.

This court granted the defendants' request to stay further proceedings pending this appeal.

After this appeal was filed, this court granted permission to the following amici curiae to file briefs: Advocates for Educational Choice; twelve individuals with severe disabilities who have filed in fictitious names; Education Law Center; Connecticut Commission on Human Rights and Opportunities; National Disability Rights Network, Association of University Centers on Disabilities, Autistic Self Advocacy Network, Disability Rights Education and Defense Fund, Judge David L. Bazelon Center for Mental Health Law, National Association of Councils on Developmental Disabilities, National Down Syndrome Congress, and the Connecticut Office of Protection and Advocacy for Persons with Disabilities; and The Arc of the United States and The Arc of Connecticut.

The other members of the Coalition are various education advocacy organizations, community groups, municipalities, local boards of education and teachers' unions.

Voting members of the Coalition had the right to participate in the election or removal of members of the steering committee, proposed amendments to the Coalition's certification of incorporation or bylaws that would deprive the members of their right to vote in an election or would result in the removal of any member of the Coalition, and any proposed amendment to the Coalition's certificate of incorporation or bylaws pertaining to dues, assessments, fines or penalties to be levied or imposed upon members. In addition, each voting member had one vote on each matter submitted to a vote at a general membership meeting, except for the election or removal of members of the steering committee.

Practice Book § 9-3 provides in relevant part: "All persons having an interest in the subject of the action, and in obtaining the judgment demanded, may be joined as plaintiffs, except as otherwise expressly provided ...."
The defendants rely on the statement of the United States Court of Appeals for the Second Circuit in Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc. , supra, 675 F.3d at 160, that "if jurisdiction is lacking at the commencement of [an action], it cannot be aided by the intervention of a [plaintiff] with a sufficient claim." (Internal quotation marks omitted.) As we have explained, however, jurisdiction over the original complaint was not lacking in the present case; rather, jurisdiction was lacking over the Coalition's claims. Thus, after the Coalition's claims were dismissed, the Coalition would not have been attempting to intervene in a nonexistent action if it had filed a motion to join the action. Cf. id. ("since intervention contemplates an existing [action] in a court of competent jurisdiction and because intervention is ancillary to the main cause of action, intervention will not be permitted to breathe life into a nonexistent [action]" [internal quotation marks omitted] ).

In addition, some courts have held that the existence of potential conflicts of interest implicates the second prong of the Worrell test; see Retired Chicago Police Assn. v. Chicago , supra, 7 F.3d at 607, citing Humane Society of the United States v. Hodel , 840 F.2d 45, 56 (D.C. Cir. 1988) ; while some have held that it implicates the third prong. See Retired Chicago Police Assn. v. Chicago , supra, at 603, citing Associated General Contractors of California, Inc. v. Coalition for Economic Equity , 950 F.2d 1401, 1408 (9th Cir. 1991), cert. denied, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). In our view, the defendants' claim fits more comfortably under the second prong of the Worrell test. The third prong, requiring proof that "neither the claim asserted nor the relief requested requires the participation of individual members in the [action]"; (internal quotation marks omitted) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell , supra, 199 Conn. at 616, 508 A.2d 743 ; does not address the situation in which a conflict of interest would require an individual member of the association to challenge the position taken by the association in court in order to protect his or her interests, but the situation in which "the individual participation of each injured party [is] indispensable to proper resolution of the cause ...." (Internal quotation marks omitted.) Hunt v. Washington State Apple Advertising Commission , supra, 432 U.S. at 342-43, 97 S.Ct. 2434 ; see also Connecticut State Medical Society v. Board of Examiners in Podiatry , 203 Conn. 295, 305, 524 A.2d 636 (1987) (when association sought declaratory relief but does not seek money damages, association meets third prong of Worrell test because court is not required to consider particular circumstances of each individual member); Paucatuck Eastern Pequot Indians v. Indian Affairs Council , 18 Conn. App. 4, 10, 555 A.2d 1003 (1989) (same).

As we have explained herein, the United States Supreme Court appears to have suggested that even if a member of an association would likely challenge the position taken by the association in court that would not necessarily defeat associational standing if other members agree with the association's position. See Brock , supra, 477 U.S. at 290, 106 S.Ct. 2523 (members of association harmed by judgment won by association might not be precluded from bringing subsequent claim); but see Maryland Highways Contractors Assn., Inc. v. Maryland , supra, 933 F.2d at 1252 (association cannot establish associational standing when "conflicts of interest among members of the association require that the members must join the [action] individually in order to protect their own interests"). We need not decide in the present case whether associational standing can be established when members of an association would be required to intervene in the action or bring a subsequent action to protect their interests because, even if that were the case, the defendants have provided no evidence that any member of the Coalition intends to challenge the positions taken by the Coalition in court.

The Coalition's 2005 bylaws provide that the purposes of the Coalition are, inter alia, to "(a) engage in activities that promote the adequate funding of education in the [s]tate of Connecticut [and] (b) engage in activities that relieve the burdens of Connecticut municipalities in funding education ...."

The plaintiffs contend that the trial court improperly determined that, under the "narrowest grounds" of agreement approach set forth in State v. Ross , supra, 272 Conn. at 604 n.13, 863 A.2d 654, Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. , provides the controlling constitutional standard because there was no agreement among the three plurality justices and Justice Palmer as to either the plurality's broad constitutional standard or Justice Palmer's narrower standard based on the Campaign I criteria. Because there was no majority support for either standard, the plaintiffs contend, neither is controlling. The plaintiffs fail to recognize, however, that the three justices in the plurality and Justice Palmer all agreed that article eighth, § 1, requires the state to provide at least the educational facilities, instrumentalities, curricula and personnel described in Campaign I. In addition, the three dissenting justices and Justice Palmer all agreed that the plurality's broader standard was too broad and would improperly entangle the courts in the legislative function of forming educational policy. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 398, 990 A.2d 206 (Vertefeuille, J. , dissenting), at 399-400, 990 A.2d 206 (Zarella, J. , dissenting). Thus, Justice Palmer's concurring opinion reflects the controlling majority agreement on both of those points.

Justice Palmer did not expressly discuss in his concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 320, 990 A.2d 206, the purpose for which the state's educational offerings must be minimally adequate. It is implicit in the Campaign I criteria, however, that the educational opportunities offered by the state must be sufficient to enable a student who takes advantage of them to attain a level of knowledge of reading, writing, mathematics, science and social studies that will enable the student to perform the basic functions of an employable adult in our society, such as reading newspapers, tax forms and other basic texts, writing a basic letter, preparing a household budget, buying groceries, operating cars and household appliances, serving on a jury and voting. See Campaign I, supra, 86 N.Y.2d at 316, 631 N.Y.S.2d 565, 655 N.E.2d 661 (sound basic education "should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury"); see also Abbeville County School District v. State , supra, 335 S.C. at 68, 515 S.E.2d 535 (under state constitution, minimally adequate education will provide students with opportunity to "acquire: [1] the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; [2] a fundamental knowledge of economic, social, and political systems, and of history and governmental process; and [3] academic and vocational skills"). We emphasize, however, that it is not the actual ability to carry out these functions that is constitutionally guaranteed, but only the opportunity to achieve that ability.

See various portions of Justice Palmer's concurring opinion in Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 328-29, 332, 336, 337, 338, 341-42, 344 n.18, 990 A.2d 206.

We address the merits of this equal protection claim in part IV of this opinion.

Specifically, the trial court considered measures of teacher quality, including the percentage of teachers who are certified, passage rates on certification examinations, years of experience, the ranking of the colleges that teachers attended, school spending on professional development and the adequacy of internal rating systems for teacher quality; see Campaign II, supra, 187 Misc.2d at 24-33, 719 N.Y.S.2d 475 ; the school system's competitiveness in the market for quality teachers; id., at 34, 719 N.Y.S.2d 475 ; the adequacy of delivery systems for school curricula, including "noncore" subjects, such as the arts and physical education, that are required to "provide a means of expression and achievement which foster self-confidence and positive attitudes about school"; id., at 37, 719 N.Y.S.2d 475 ; the poor condition of school facilities and classrooms, including "overcrowding, poor wiring, pock-marked plaster and peeling paint [and] inadequate (or nonexistent) climate control"; id., at 39, 719 N.Y.S.2d 475 ; classroom overcrowding and class size; id., at 49, 719 N.Y.S.2d 475 ; the quantity and quality of textbooks; id., at 56-57, 719 N.Y.S.2d 475 ; the number of library books per student; id., at 57, 719 N.Y.S.2d 475 ; the adequacy of classroom supplies and equipment, such as beakers, Bunsen burners, beam balances, microscopes, chalk, paper, art supplies, desks and chairs; id., at 57-58, 719 N.Y.S.2d 475 ; the adequacy of instructional technology, such as computers, printers, modems and software; id., at 58, 719 N.Y.S.2d 475 ; graduation rates; id., at 60, 719 N.Y.S.2d 475 ; scores on standardized tests; id., at 64, 719 N.Y.S.2d 475 ; and whether there was a causal link between the state's public school funding system and the educational opportunity that the plaintiffs were receiving. Id., at 68, 719 N.Y.S.2d 475.

"Title VI [of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (2012) ] provides [in relevant part]: 'No person in the United States Shall on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' " Campaign I, supra, 86 N.Y.2d at 321, 631 N.Y.S.2d 565, 655 N.E.2d 661.

See Campaign II, supra, 187 Misc.2d at 27, 719 N.Y.S.2d 475 ("in New York [s]tate, localities other than New York City experience nowhere near the shortages [of certified teachers] seen in the [c]ity"; id., at 28, 719 N.Y.S.2d 475 (first time failure rate for teachers taking basic liberal arts and science test "was 31.1 [percent in New York City], compared with 4.7 [percent] for teachers elsewhere in the [s]tate"); id., at 29, 719 N.Y.S.2d 475 (evidence showed that "the average New York City public school teacher attended a less competitive college than the average public school teacher in the rest of the [s]tate"); id., at 34, 719 N.Y.S.2d 475 ("New York City's public schools' lack of competitiveness in the relevant labor market can be seen by comparing the qualifications of New York City's public school teachers with those who work in public schools in the counties near New York City"); id., at 53, 719 N.Y.S.2d 475 ("New York City's class sizes have been consistently higher than the [s]tate average"); id., at 58, 719 N.Y.S.2d 475 ("[i]n 1997, districts in the [s]tate outside of New York City had twice as many computers per 100 students as did the [c]ity").

Of course, the state did not claim in Campaign II that it was "excused" from providing a sound, basic education to students with "socioeconomic deficits." Campaign II, supra, 187 Misc.2d at 63, 719 N.Y.S.2d 475. It claimed only that its constitutional obligation was satisfied if it provided those students with an opportunity for a sound basic education. Id.

Although disparities in achievement that are the result of disadvantaging conditions are generally uninformative on the question of whether the state is providing a minimally adequate educational opportunity, there are situations in which disparities in outcome might be informative. For example, if two school districts with similar demographic characteristics have wide disparities in educational outputs, that fact might inform a court's constitutional analysis because it reasonably might be inferred that the gap is the result of disparities in educational inputs, which are the proper subject of the court's constitutional analysis.

In his concurring and dissenting opinion in this case, Justice Palmer contends that it is clear, from his conclusion in Connecticut Coalition for Justice in Education Funding, Inc. , that the plaintiffs' claims were legally cognizable, that he contemplated that Campaign I "requires not only that the state provide the essential components of a minimally adequate education, including facilities, instrumentalities, curricula, and personnel, but also that some reasonable effort be made to ensure that those modalities are designed to address the basic educational needs of at risk learners in underprivileged communities." As we explain more fully later in this opinion, it is clear to us that this is an expansion of the Campaign I criteria. We note, however, that Justice Palmer makes no claim that the trial court should have considered all of the factors that the court considered in Campaign II.
We note that the opinion by Justice Palmer in this case concurs with the majority in part and dissents in part. For purposes of simplicity, we refer to it as the dissenting opinion.

Thus, the dissent's contention that we have failed to recognize that "the rationality test is part and parcel of Campaign I " is incorrect. To the contrary, that is the very basis for our conclusion that the trial court properly considered the reasonableness of the state's educational offerings.

The dissent contends that this reasoning is "circular," and that we have improperly presumed that the trial court properly applied the Campaign I criteria. It is well established, however, that, "[a]bsent a record that demonstrates that the trial court's reasoning was in error, we presume that the trial court correctly analyzed the law and the facts in rendering its judgment." DiBella v. Widlitz , 207 Conn. 194, 203-204, 541 A.2d 91 (1988). Contrary to the dissent's contention, it has not "demonstrated" that the trial court misapplied Campaign I. Rather, as we discuss more fully later in this opinion, because nothing in the record demonstrates that the trial court misunderstood the Campaign I standard or failed to consider the evidence presented by the plaintiffs, the dissent has improperly presumed that the trial court did not properly apply that standard.

We conclude in part III of this opinion that the trial court's factual findings do not compel the conclusion that the state's educational offerings are constitutionally inadequate.

We do not disagree that the trial court found that many poor and needy schools are "utterly failing." Taken in context, however, it is clear that the trial court was not suggesting that the state is failing to meet its constitutional obligation. Specifically, immediately before making this observation, the court noted that the state's new academic standards governing what high school students must learn in order to graduate "can't do much good where they're needed most because they don't stop students from graduating when they fall miles below the standard." Thus, this finding related to educational outcomes , which are not the proper subject of a Campaign I analysis. The dissent also contends that the trial court improperly focused on the state's expenditures rather than the adequacy of its educational offerings. As we have explained, however, the court expressly found that the state is making these expenditures in order to provide specific resources for needy students.

We note that the dissent relies on a quote from the plurality opinion in Connecticut Coalition for Justice in Education Funding, Inc. , not from Justice Palmer's concurring opinion, in which he expressly rejected the plurality's suggestion that the trial court could consider educational outcomes as part of its constitutional analysis. See Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 345 n.19, 990 A.2d 206 (Palmer, J. , concurring in the judgment).

The trial court did not specify the periods for which the East Hartford and Danbury budgets for, respectively, library books and textbooks were zero.
The plaintiffs also contend that the state is not providing minimally adequate access to modern technology in some schools. Even if we were to assume, however, that the adequacy of computer access must be considered under the Campaign I criteria; cf. Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 342 n.16, 990 A.2d 206 (Palmer, J. , concurring in the judgment) ("I express no view .. as to whether [technologies such as computers] ... may be necessary to a minimally adequate education"); the trial court expressly found that, although "[t]here are certainly some hardships with computers and significant disparities in computer access," the state is providing the constitutionally required minimum. The plaintiffs have not explained why this conclusion was erroneous as a matter of law, or what specific level of computer access would be required to be minimally adequate.

The dissenting opinion contends that there "is no indication that the trial court even considered whether school security, transportation, and other essentials are minimally adequate before concluding that the plaintiffs had failed to establish a violation under Campaign I. " The plaintiffs make no claim on appeal, however, and point to no evidence that would support a finding that school security or transportation is so lacking in any particular school district that the district does not satisfy the constitutional standard. The only evidence in the record on this issue is the trial court's finding that some high school students in Bridgeport are required to take municipal buses to school at the government's expense. We conclude that, as a matter of law, this does not render the Bridgeport schools constitutionally inadequate.

We recognize, of course, that the lack of such support services makes it extremely difficult for many students in the state's neediest school districts to take advantage of the state's educational offerings. Schools, however, are not the exclusive source of these services. Rather, the Department of Social Services, the Department of Children and Families, the Department of Mental Health and Addiction Services and other state agencies all play a role in providing such services to those in need. It simply is not the role of the courts to determine the extent to which such services must be provided by the schools rather than these other state agencies, as this would be a clear violation of the separation of powers.

We apply the same standard of review to this claim that we applied to the plaintiffs' claim pursuant to article eighth, § 1. See part III of this opinion.

The thirty Alliance District program school districts are Ansonia, Bloomfield, Bridgeport, Bristol, Danbury, Derby, East Hartford, East Haven, East Windsor, Hamden, Hartford, Killingly, Manchester, Meriden, Middletown, Naugatuck, New Britain, New Haven, New London, Norwalk, Norwich, Putnam, Stamford, Vernon, Waterbury, West Haven, Winchester, Windham, Windsor and Windsor Locks.

Although the trial court did not apply the three part Horton II standard when it concluded that the plaintiffs had failed to establish an equal protection violation under the state constitution, because the issue involves a question of law, we may apply that standard in the first instance, as the court did in Horton II. See Horton II , supra, 195 Conn. at 38, 41, 486 A.2d 1099 (adopting three part standard for first time and concluding that plaintiffs had not satisfied it); see also Lapointe v. Commissioner of Correction , 316 Conn. 225, 310, 112 A.3d 1 (2015) ( "[a]mong the questions of law belonging to the jurisdiction of this court ... are ... questions of legal conclusion when law and fact are so intermingled that the main fact is not a pure question of fact but a question of the legal conclusion to be drawn from subordinate facts" [internal quotation marks omitted] ).

The specific claim that the plaintiffs raised in the Horton case was that "the present system of financing public education in Connecticut, principally embodied in [General Statutes §§] 10-240 and 10-241... insofar as the system purports to delegate to the town of Canton the duty of raising taxes to operate free public elementary and secondary schools and insofar as it purports to delegate to Canton the duty of operating and maintaining free public elementary and secondary schools violates the constitution of Connecticut, article first, §§ 1 and 20, and article eighth, § 1 ...." Horton I , supra, 172 Conn. at 621, 376 A.2d 359. Because the state contributed only 20 to 25 percent of the total cost of education statewide, and because the amount of state aid provided to the towns was not based on their respective ability to finance education; id., at 628-29, 376 A.2d 359 ; all towns were heavily dependent on local property taxes to fund education. Id., at 630, 376 A.2d 359. Thus, the focus of the judicial inquiry in that case was the comparative ability of towns with high property tax bases and towns with low property tax bases to fund education. Id., at 629-32, 376 A.2d 359. It was in this context that the court in Horton II relied on continuing significant disparities in educational spending among the various towns, including a high-to-low spending ratio ranging from 2.14 to 2.45 over the relevant time period, to support the parties' concession that the plaintiffs had established the first prong of the constitutional standard, that there were "continued significant disparities in the funds that local communities spend on basic public education." Horton II , supra, 195 Conn. at 39, 486 A.2d 1099.
We recognize that the statistical evidence that the court cited in Horton II did not expressly correlate these spending disparities among the towns to disparities in the wealth of the towns as reflected in their property tax bases. See id., at 39 n.15, 486 A.2d 1099. Because the disparities between education spending by wealthy towns as compared to poorer towns was the sole issue in Horton I , however, it is reasonable to conclude that correlation continued to exist. Otherwise, the comparisons that the court cited in Horton II would have been meaningless. If there was no such correlation, that fact would only highlight the dangers that lurk when courts rely on complex statistical analyses without fully understanding their implications. It would not justify relying on an equally meaningless comparison in the present case.

To the extent that the plaintiffs contend that the disparities in spending between schools with large numbers of poor and needy students and other schools is more than de minimis because the state's neediest students require significantly more funds than other students to achieve a substantially equal level of educational achievement , we are not persuaded. In support of this claim, the plaintiffs rely on the 2011 report of their expert witnesses, Bruce Baker and Robert Bifulco. Baker and Bifulco concluded that "the highest need districts require 50 [percent] to 100 [percent] more funding than the lowest need districts to provide equal educational opportunities." Baker and Bifulco incorrectly assumed, however, that the plurality opinion in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 240, 990 A.2d 206, provides the governing constitutional standard. Specifically, they assumed that the Connecticut constitution "guarantees Connecticut's public school students educational standards and resources suitable to [prepare them to] participate in democratic institutions, and ... to attain productive employment and otherwise to contribute to the state's economy, or to progress on to higher education." Id., at 244-45, 990 A.2d 206 (plurality opinion). As we have explained, however, Justice Palmer's concurring opinion in Connecticut Coalition for Justice in Education Funding, Inc. is controlling, not the plurality opinion. See footnote 24 of this opinion. As we have also explained, Justice Palmer expressly rejected this portion of the plurality's constitutional standard; see id., at 345 n.19, 990 A.2d 206 (Palmer J. , concurring in the judgment); in favor of a standard that focused on educational inputs , specifically, the Campaign I criteria. See id., at 342, 990 A.2d 206 (Palmer, J. , concurring in the judgment); see also footnote 24 of this opinion. We conclude, therefore, that the fact that the state is not providing funds to schools with large numbers of poor and needy students in an amount that would allow those students to achieve the same educational level as other students does not constitute prima facie evidence of unconstitutional disparities in funding.

We note, for example, that the evidence shows that, in 2013, the town that was ranked last out of 169 towns in per student expenditures, namely, Ellington, was ranked 114th in wealth as measured by "equalized net grand list per capita." Similarly, a number of towns that ranked very low in wealth ranked relatively high in student expenditures. For example, Hartford, Bridgeport, and New Haven, which ranked, respectively, 165th, 164th and 163rd out of 169 towns in wealth, ranked 19th, 114th and 31st, respectively, in per student spending. Although we draw no definitive conclusions from this evidence, it certainly does not seem to support the inference that per student expenditures are directly correlated to the number of poor and needy students in a town.

The defendants' expert witness, Michael Wolkoff, explained in his expert report that he limited his analysis to school districts with enrollments greater than 1000 because "[s]maller school districts have the potential to influence the results as they are most likely to have their per pupil expenditure totals elevated due to diseconomies of scale." He also indicated, however, that his "analyses for districts with enrollments greater than 1000 are very similar to those that [he] found using all districts ...."

Other evidence shows a similar discrepancy between per pupil spending in the neediest and the least needy decile of school districts as measured by the number of students receiving a free lunch.

Other evidence shows a similar discrepancy in the aid provided to the school districts with the largest percentage of needy students and school districts with the smallest percentage of such students, as measured by the percentage of students receiving a free lunch.
The trial court noted that in 2016, in the face of "a bone crushing fiscal crisis," the state cut education funds to fourteen of the neediest school districts by approximately $5.3 million at the same time that it increased funds to twenty-two comparatively wealthy school districts by approximately $5.2 million. Such anecdotal evidence, however, does not compel the conclusion that, contrary to the trial court's finding, there are systematic and ongoing disparities in the education funds that the state provides to needy districts as compared to wealthier districts, especially in light of the trial court's finding that, since 2012, the state had funneled "over $400 million in new money" into the state's thirty lowest performing schools. Indeed, we take judicial notice that, in 2017, the legislature adopted a budget that cut primary state grants to public schools by $30 million overall, but shielded the thirty Alliance Districts from any cuts. See J. Thomas, "Education Aid: Here's What is in the Bipartisan [Connecticut] Budget Plan," The Connecticut Mirror, October 25, 2017, available at https://ctmirror.org/2017/10/25/education-aid-heres-what-is-in-the-bipartisan-ct-budget-plan, last visited January 17, 2018.

See footnote 3 of the majority opinion.

Campaign for Fiscal Equity, Inc. v. State , 86 N.Y.2d 307, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995).

See Campaign for Fiscal Equity, Inc. v. State , supra, 86 N.Y.2d at 307, 318, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) (trial court required to determine whether New York City school children were receiving sound, basic education).

Because the question is not before us, I express no opinion as to whether and under what circumstances article eighth, § 1, might be offended solely on the basis of evidence that an individual student has been denied minimally adequate educational opportunities.

See, e.g., Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 244-45, 990 A.2d 206 (plurality opinion) ("we conclude that article eighth, § 1, of the Connecticut constitution guarantees Connecticut's public school students educational standards and resources suitable to participate in democratic institutions, and to prepare them to attain productive employment and otherwise to contribute to the state's economy, or to progress on to higher education" [emphasis added] ); id., at 314-15, 990 A.2d 206 (plurality opinion) ("Thus, we conclude that article eighth, § 1, entitles Connecticut public school students to an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting. A constitutionally adequate education also will leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy.").

I wrote separately in Rell primarily (1) to emphasize the special and considerable deference that is owed to the legislature in these matters; see, e.g., Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 321-22, 332, 335-43, 344 n.18, 990 A.2d 206 (Palmer, J. , concurring in the judgment); (2) to highlight the importance of defining the constitutional standard with sufficient precision at the outset to give the parties and the trial court adequate guidance; id., at 342-43 n.17, 990 A.2d 206 (Palmer, J. , concurring in the judgment); and (3) to express my belief that it was inappropriate to defer to the remedy stage (a) the question of whether the plaintiffs' claims were justiciable; id., at 327-28 n.10, 990 A.2d 206 (Palmer, J. , concurring in the judgment); and (b) related prudential considerations. Id., at 338-39 n.12, 990 A.2d 206 (Palmer, J. , concurring in the judgment).

The majority contends that the standard that I articulate in this opinion goes beyond and is broader than the one that I articulated in Rell. For the reasons set forth herein, that is incorrect. In any event, as I explain in part II of this opinion, the trial court failed to properly apply the Campaign I test under even the narrowest fair reading of that standard.

I wish to recognize, and to emphasize, that the trial court had before it a Herculean task. It was charged with divining a governing legal standard from the area of overlap between two less than crystal clear opinions in Rell and then applying that standard, with virtually no guiding precedent, to an enormous and complex factual record covering a field-education-that accounts for a significant share of all public expenditures.

There also is no indication that the trial court even considered whether school security, transportation, and other essentials are minimally adequate before concluding that the plaintiffs had failed to establish a violation under Campaign I.

The trial court appears to have read my concurrence in Rell to mean that Campaign I was concerned principally with questions of financial resources. The court stated, for example, that "Justice Palmer appeared to view [Campaign I ] as enough to consider about resources ...." (Emphasis added.) The court also referenced my concurrence in support of its conclusion that, "[b]eyond a bare minimum, the judiciary is constitutionally unfit to set the total amount of money the state has to spend on schools." I do not believe, and I do not understand the majority to believe, that my concurrence in Rell supports such an interpretation.

The majority contends that we must assume that the trial court considered all of its 1060 specific factual findings in conducting the Campaign I analysis in parts 3 and 4 of its decision, and that it is implicit in the trial court's factual findings that this reasonableness standard was met. This reading of the trial court's decision, however, is demonstrably wrong. It defies logic to think that the trial court, which waited to expressly evaluate these findings and described the state's educational failings at great length in the second half of its decision, already had considered all of them sub silentio in the context of its Campaign I analysis but concluded that not even one of its hundreds of troubling findings regarding deficiencies in the schools warranted mention or discussion therein. That would be a truly bizarre way to craft a judicial decision, and there is simply no indication that the court did so. Rather, it is readily apparent that the court misread Rell and felt constrained not to consider in the context of Campaign I either its conclusion that many of Connecticut's schools are "utterly failing" or the myriad factual findings that supported that conclusion. If there were any doubt as to whether the court factored its findings into its Campaign I analysis, then this court should order an articulation. See Practice Book § 60-5.
For the same reason, the majority's reliance on the assumption that the court found that "the state's educational offerings, even in the poorest school districts, are sufficient to enable students who take advantage of them to become functional members of society" is misplaced. There is no indication whatsoever in the trial court's memorandum of decision that the trial court ever made such a finding, and the majority is unable to point to any language to support its reading of the court's decision.

The court also noted that facility issues in the town of Windham and the city of New London were "already on the state's list to be fixed and fixed mostly with state money." It is unclear how this observation factored into the court's Campaign I analysis.

That the court considered educational adequacy only from an aggregate standpoint in the first half of its decision becomes clear in the second half, when the court turns its attention to the problems facing individual school districts, explains the "flaw of averages," and concludes that the state is not allocating sufficient funds to its poorer cities. The court states, for example, that "[t]he children in most Connecticut towns do well on tests and some do extremely well, pulling up the average to impressive heights. But viewed individually, the state of education in some towns is alarming." The court ultimately concluded: "But if the egregious gaps between rich and poor school districts in this state don't require more overall state spending, they at least cry out for coherently calibrated state spending."

The court concluded, for example, that a different method of evaluating and compensating teachers would be preferable, social promotion should be curtailed, and fewer resources should be spent educating severely disabled children. These are matters over which administrators reasonably may disagree with teachers, parents with students, and legislators with taxpayers. The irrationality of one position or the other would have to be far more conspicuous for a court to be justified in resolving the debate by judicial fiat.

The majority relies in this respect on the circular argument that, because the Campaign I test encompasses certain considerations, and because the trial court purported to apply Campaign I , the court must have taken those considerations into account and found them to be satisfied. The obvious flaw in this reasoning is that, if the court misunderstood and misapplied Campaign I , as I have demonstrated in part II B of this opinion, then there is no reason to assume consequences that would flow from the court's proper application of the test.

What follows should not be taken either as a determination that the plaintiffs have established a constitutional violation or as a comprehensive canvass of the constitutionally relevant evidence that was presented at trial. My purpose is merely to identify examples of some of the types of evidence the plaintiffs have presented that the trial court, serving as the finder of fact, would need to consider under the proper legal standard.

For example, "[a] town may not [merely] herd children in an open field to hear lectures by illiterates." (Emphasis omitted; internal quotation marks omitted.) Connecticut Coalition for Justice in Education Funding, Inc. v. Rell , supra, 295 Conn. at 283-84, 990 A.2d 206 (plurality opinion).

The term "white students," as used in this opinion, refers to non-Hispanic, white students.